UNITED STATES of America,
Plaintiff-Appellee,

v.

Douglas W. ALBERT, Bennard D. Jackson, Gilbert Gonzalez, Jesse C. Smith, John J. Davis and Richard Y. Garcia, Defendants-Appellants.

Nos. 76–2560, 76–4350.

United States Court of Appeals,
Fifth Circuit.

May 21, 1979.

Rehearing and Rehearing En Banc
Denied July 2, 1979.

James A. Moore, Robert C. Hunt, Ray B. Martin, Houston, Tex., for defendants-appellants.

J. A. Canales, U. S. Atty., James R. Gough, George A. Kelt, Jr., Asst. U. S. Attys., Houston, Tex., Scott Campbell, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GODBOLD, SIMPSON and GEE, Circuit Judges.

GODBOLD, Circuit Judge:

The defendants were charged in an eight-count indictment with conspiring to deprive United States citizens of guaranteed rights, 18 U.S.C. § 241, depriving persons of property without due process of law and under color of state law, 18 U.S.C. § 242, and filing false income tax returns, 26 U.S.C. § 7206(1). Each was convicted by a jury on one or more counts.[1] All appeal. We affirm all convictions.

### The facts

All defendants were members of the Narcotics Division of the Houston Texas Police Department. The evidence at trial supported the following version of the facts. In the spring and summer of 1972 defendants and others[2] participated or aided in placing and monitoring unlawful wiretaps on telephone lines to gain information about drug traffic in Houston. These wiretaps revealed that a sale of marijuana was to take place in Houston in July 1972 between Geronimo Torres, a Houston seller, and Charles Jacobs, a Michigan buyer. It was also learned that John Huston of Michigan was to transport the marijuana from Houston to Michigan.

The transfer of the marijuana took place in a motel in Houston. Jacobs gave Huston about $300 for his expenses, and Huston left the motel in a car containing the marijuana. Jacobs also gave Torres $900 as a final payment on the marijuana. After these transactions Jacobs had approximately $9,000 in cash on his person.

1. All were found guilty of conspiracy. Also, Albert, Jackson, Gonzalez and Smith were found guilty of deprivation of property without due process and under color of state law, and Albert, Gonzalez and Smith were found guilty of filing false income tax returns.

2. Carlos Avila and Antonio Zavala were also indicted but pleaded guilty to other crimes and testified for the government at the trial of these defendants. Michael Chavez entered a plea of guilty in another case, was not indicted in the present case, and was a government witness. Avila, Zavala, and Chavez were all members of the Narcotics Division during the time the offenses charged took place.

Jacobs and Torres remained at the motel after Huston departed. Soon thereafter witness Avila and defendant Jackson appeared at the motel room of Torres and Jacobs, identified themselves as police officers and entered. A short time later defendant Albert arrived at the room.[3] Torres and Jacobs were then beaten by one or more of the officers. Avila took the $900 Torres had and later divided it with witness Chavez. Jackson seized Jacobs' cash and gave it to Albert. No report was made of the seizure of this money. It was not included on property receipts given to Jacobs and Torres, and it was never returned.

Huston was stopped shortly after leaving the motel by persons identifying themselves as Houston police officers. He too was beaten and the $300 he had was seized and has never been accounted for or returned.

After Jacobs, Torres, Huston and the confiscated marijuana had been taken to the police station, witnesses Avila and Zavala and defendants Albert, Jackson and Gonzalez prepared a list of the officers who had participated in the investigation and how much of the stolen money from the raid each was to get.[4] The money was then divided.

These prosecutions followed.

The following alleged trial errors require discussion: (1) denial of motion for continuance, (2) denial of speedy trial, (3) admission of testimony of a prior crime of defendant Gonzalez, (4) admission of a tape recording as a prior consistent statement of a government witness, (5) outside communication with the jury. Other claims of error—sequestration of the jury, lack of evidence to support convictions of defendants Garcia and Davis, and reversible cumulative error—do not merit discussion.

### (1.) Denial of continuance

Defendants moved for a continuance based on the illness of prospective defense witness Sgt. Robert Hosford of the Houston Police Department, defendants' immediate superior.

The denial of a continuance is within the discretion of the trial judge, e. g., *Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *U. S. v. Sahley*, 526 F.2d 913 (CA5, 1976); *U. S. v. Gidley*, 527 F.2d 1345 (CA5, 1976); *U. S. v. Ruiz*, 533 F.2d 939 (CA5, 1976), and will be disturbed on appeal only on a clear showing of abuse of discretion by the trial court, e. g., *U. S. v. Moriarity*, 497 F.2d 486 (CA5, 1974); *U. S. v. Harper*, 505 F.2d 924 (CA5, 1974). Whether a trial court has abused this discretion is decided on a case-by-case basis in light of the circumstances. *Ungar; McKinney v. Wainwright*, 488 F.2d 28 (CA5, 1974); *U. S. v. Uptain*, 531 F.2d 1281 (CA5, 1976). Of particular importance are the reasons for continuance presented to the trial court. *Ungar & Uptain*. A request for continuance should be advanced with all specificity and detail feasible under the circumstances and presented as early as possible. *Uptain*.

In the present case there has been no showing of an abuse of discretion. Although Hosford suffered a stroke on December 18, 1975, the motion for continuance was not filed until February 11, 1976, only six days before trial was set to begin. To delay what was foreseen to be, and indeed was, a long and complex trial so close to its beginning required a showing to the trial court of strong reasons. Defendants in their motion stated only that Hosford's testimony was "material and relevant" and that he was the only witness capable of presenting "material evidence." Because these were the only reasons given they took on special significance. *Ungar*. The trial court found that because of the paucity of information contained in the conclusory assertions of the motion, it was unable to determine whether Hosford's testimony would be material, whether it would be

---

3. The evidence shows that other, unidentified officers may have come into the motel room at some time while Torres and Jacobs were being beaten and arrested and while the money was being taken.

4. Other, unidentified officers may have participated in making this list.

substantially favorable to defendants, whether it would be corroborative or cumulative, and whether it could be obtained through other witnesses or other sources.

The defendants made no representation concerning when Hosford would be able to testify except that he "should be available in the near future" and that he was "steadily improving."[5] The trial court found, on the basis of these statements, that it could not evaluate when Hosford would be available to testify. Thus, defendants made no sufficient showing that Hosford would be able to testify if a continuance was granted. See Blackwell v. U. S., 405 F.2d 625 (CA5, 1969). The prosecution offered to stipulate to the substance of Hosford's testimony by direct stipulation of fact and by stipulated admission of portions of Hosford's testimony in prior related proceedings. In addition, the prosecution offered to cooperate in taking Hosford's deposition. Defendants refused these offers. While defendants were not compelled to accept the offers, the possibility of these alternative sources for the testimony Hosford would have given may be taken into account in determining whether a delay was justified.

■ The defendants review the trial record and point to testimony which, they say, demonstrates the significance of Hosford as a witness. But the trial court cannot be put in error for matters not made known to it when the motion was presented.

The court did not abuse its discretion in declining to grant a continuance.

### (2.) Speedy trial

Defendants maintain that the indictments should have been dismissed for delays between indictment and arraignment and between arraignment and trial, viola-

tive of the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161 et seq., and the Rule 50(b) Plan for the United States District Court for the Southern District of Texas for Achieving Prompt Disposition of Criminal Cases. The district court did not err in failing to dismiss the indictments.

The indictments were returned May 31, 1974. Defendants were arraigned October 31, 1975, and trial began February 17, 1976.

■ Since indictment, arraignment and trial all occurred before July 1, 1976, the time limitations of the Speedy Trial Act of 1974, 18 U.S.C. § 3161(c), do not apply.[6] 18 U.S.C. § 3163(b); U. S. v. Garza, 547 F.2d 1234 (CA5, 1977).

The Rule 50(b) Plan in effect at the time in question required that arraignment occur within 30 days of indictment and that trial take place within 90 days of the arraignment for high risk defendants.[7]

Seventeen months elapsed between indictment and arraignment. However, most of this time was spent pursuing an interlocutory appeal to this court to determine whether defense attorneys should be disqualified for conflict of interest. It was the duty of the prosecution to call attention to the possible existence of a conflict of interest. The trial judge ruled that there was a fatal conflict, but this court reversed. U. S. v. Garcia, 517 F.2d 272 (CA5, 1975). Three and one-half months passed between arraignment and trial. Trial had been set for early January 1976, but was moved to February 18 because of an earlier trial still in progress before the original trial judge and because of that judge's poor health.

■ Rule 50(b) plans are "not inflexible and noncompliance therewith does not automatically result in dismissal." U. S. v.

---

5. Appellants tell us that Hosford would have been able to testify in July 1976, but this is with the benefit of hindsight.

6. Defendants allege that, because they were designated as high risk defendants by the government, the interim requirements of § 3164 of the Speedy Trial Act applies to them requiring that they be tried within 180 days of July 1, 1975. However, § 3164 deals with the custodi-

al situation of defendants awaiting trial and has no provision for dismissal of indictments if its limitations are exceeded.

7. This plan went into effect September 9, 1975, between indictment and arraignment. The previous plan had limits of 45 days between indictment and arraignment and 90 days between indictment and trial.

*Maizumi,* 526 F.2d 848 (CA5, 1976); *see also, U. S. v. Garcia,* 553 F.2d 432 (CA5, 1977); *U. S. v. Bloom,* 538 F.2d 704 (CA5, 1976); *U. S. v. Atkins,* 528 F.2d 1352 (CA5, 1976); *U. S. v. Pena,* 527 F.2d 1356 (CA5, 1976); *U. S. v. Clendening,* 526 F.2d 842 (CA5, 1976). A 50(b) plan is "not intended to impose arbitrary or impractical penalties on the system of criminal justice it seeks to expedite." *U. S. v. Rodriguez,* 497 F.2d 172 (CA5, 1974).

█ The delay between the end of the interlocutory appeal and arraignment was short,[8] and the delay beyond the plan limit between arraignment and trial was only 18 days. Given the complexity of this case and the multiplicity of defendants,[9] the short period by which the 50(b) plan time was extended, and the reasons for the extensions,[10] the district court was not in error in refusing to dismiss the indictment because of noncompliance with the 50(b) plan.

### (3.) *Evidence of prior criminal activity*

The court allowed testimony by Chavez, an unindicted coconspirator and government witness, and formerly an officer in the Narcotics Division, *see* n.2, *supra*, concerning events that occurred in 1969 or 1970 involving defendant Gonzalez. Chavez testified that, as a result of use of an illegal wiretap, a pound of heroin was seized from a suspect. It was brought to Chavez by officers Zavala, *see* n.2, *supra*, and Collins. Chavez turned the heroin over to an informer who gave Chavez $8,000 in return. Chavez met Gonzalez, Zavala and Collins at a ballroom and "sliced the pie" with them by giving each $2,000. Chavez acknowledged that his receipt of the heroin was "theft of heroin from a narcotics suspect." Counsel for defendants objected to Chavez's testimony on the ground that it related to an extraneous offense. The objection was overruled, and no limiting instruction was requested.

█ We examine the admissibility of the testimony under the standards of *U. S. v. Beechum,* 582 F.2d 898 (CA5, 1978) (en banc) *cert. denied,* —— U.S. ——, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). We conclude that it was admissible against Gonzalez under F.R.Evid. 404(b) for the purpose of showing that in 1972 he and other police officers were involved in a scheme to deprive narcotics offenders in Houston of their property through the use of wiretaps.[11] For this purpose, the district judge could find that the evidence of the 1969 scheme was relevant under Rule 401. He could find that there was sufficient evidence for the jury to conclude that Gonzalez in fact participated in the 1969 offense. And, under Rule 403, he could find that the probative value outweighed the danger of undue prejudice to Gonzalez. In this connection we must consider the government's need for the evidence. Its case rested upon testimony of narcotics offenders whose money had been taken and who had been beaten, and of other officers involved who had pleaded guilty pursuant to plea bargains or had been convicted of committing perjury before the grand jury. The government did not have so strong a case that the incremental value of Chavez's testimony was slight. The probative value of the extrinsic offense evidence was strong because of the high degree of similarity between the two occurrences. In both, wiretaps were used, officers of the Houston Police Department were participants, money or property was mulcted from narcotics offenders, and police officers split the "take." Finally, the two events were not

---

**8.** The Fifth Circuit mandate was filed in the district court September 2, 1975, and arraignment was October 31, 1975.

**9.** *See U. S. v. Bloom, supra.*

**10.** Several cases also note that the docket for the District Court for the Southern District of Texas has been exceptionally crowded which is to be considered in determining reasonableness of delay. *E. g., Bloom, Pena, Clendening, Rodriguez.*

**11.** Discussion at trial centered on admissibility to show "intent." But defendants were not misled by this because the limiting instruction, requested later, included motive, intent, scheme, design, and propensity.

too temporally remote, one in 1969 or 1970, the other in 1972.[12]

**[11]** Several days after the testimony was admitted defense counsel filed written requests for jury instructions. Included was an instruction limiting testimony concerning the 1969 events to the purpose of showing Gonzalez's "motive, intent, scheme and design and propensity to participate" in the conspiracy charged in the indictment, and instructing that the 1969 events were not to be considered at all with respect to the other defendants. Pretermitting the untimeliness of the request, while this charge contained correct elements the court did not err in refusing it because it was internally inconsistent and misleading. In addition to what we have already described it said: "You are not to concern yourself with the question of whether or not the defendant Gilbert Gonzalez participated in said criminal offense or is anyway guilty of the alleged sale of heroin in 1969." Gonzalez's participation in the 1969 offense was the whole point of the collateral offense matter.

■ The defendants other than Gonzalez assert that even if Chavez's testimony was admissible against Gonzalez it was not admissible against them, and the jury should have been so instructed. We agree that evidence of Gonzalez's prior misdeeds, occurring before the charged conspiracy began, was not even "relevant" to these other defendants under Rule 401. The limiting instruction belatedly requested was flawed, as already described. Also, since the Chavez testimony only related to Gonzalez, and none of the other defendants was mentioned in connection with it or during the time frame covered by it, the contention that the jury would consider it at all with respect to the other defendants is somewhat attenuated. Also, elsewhere in his charge, the judge instructed that in determining whether a particular defendant was a member of the conspiracy, if any, the jury should consider only his acts and statements, and that he could not be bound by the acts or declarations of other participants until it was established that a conspiracy existed and that he was one of its members. We hold that there was no reversible error as to these other defendants.

**(4.)** *Admission of tape recording*

■ The trial court allowed into evidence a tape recording between government witness Chavez and a drug dealer, portions of which corroborated Chavez's trial testimony. Defendants urge that this was inadmissible hearsay. The trial court admitted the tape under Fed.R.Evid. 801(d)(1)(B)[13] as a prior consistent statement used to rehabilitate a witness who has been attacked for recent fabrication of his testimony or improper motivation for his testimony.

The trial court did not err. Chavez testified and underwent vigorous cross-examination. The content of the tape was consistent with his testimony at trial. There may be some doubt whether express charges of improper motive or recent fabrication were made, but the defense attorney, during his cross-examination of Chavez, implied improper motive or recent fabrication. Several times the defense counsel brought out that it was not until an arrangement was worked out between the government and Chavez on charges against him that he agreed to testify against the defendants.

■ Defendants also say that the tape was inadmissible because the government did not show, other than by the testimony of Chavez, that the tape was authentic and had not been tampered with.

Rule 901 of the Federal Rules of Evidence provides in part:

**12.** In *U. S. v. Kirk*, 528 F.2d 1057 (CA5, 1976), three years was held not too remote.

**13.** "Statements which are not hearsay.
A statement is not hearsay if—
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is . . .
(B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive . . . .."

(a) General provision.—The requirement. of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations.—By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) Testimony of witness with knowledge.—Testimony that a matter is what it is claimed to be. . . .

(5) Voice identification.—Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

Further, a trial judge may admit physical evidence if he is satisfied that in reasonable probability the article has not been changed in any important respect from its original condition. E. g., U. S. v. Daughtry, 502 F.2d 1019 (CA5, 1974); U. S. v. Brown, 482 F.2d 1226 (CA8, 1973); Gallego v. U. S., 276 F.2d 914 (CA9, 1960); Wigmore, Evidence 3d ed., § 437(1).[14]

▮ Here, Chavez identified the voices on the tape and stated that the conversation on the tape was the one he had conducted with the drug dealer at the time the recording was made. This testimony by Chavez meets the admissibility requirements of Rule 901. Chavez was available for and was put through cross-examination concerning his identification of the voices and the conversation on the tape. Any doubts the defendants may have raised about his identification went to the weight and not the admissibility of the tape.

### (5.) Communications with jury

Early in the first full day of jury deliberation, two Assistant United States Marshals made statements to members of the jury to the effect that "it shouldn't take you long to reach a verdict in this case" and "we were up early so we could get through today." Upon learning of these communications, the Marshal's Service had the foreman of the jury investigate the matter, take statements from other jurors and make a written report to the Marshal's Service. This report was given to the trial court the next day. Following the verdict a full-scale hearing was held on this incident and the trial court found that these communications had not been harmful and denied defendant's motion for new trial based on this occurrence.

▮ Prejudicial private communications between jurors and third persons are, of course, prohibited. E. g., Mattox v. U. S., 146 U.S. 140, 150, 13 S.Ct. 50, 36 L.Ed. 917 (1892); Remmer v. U. S., 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956); Tillman v. U. S., 406 F.2d 930 (CA5, 1969). However, if, by means of a hearing or other investigation by the trial court, the private communications are shown to be harmless, a new trial is not required. Id. The granting of a new trial because of outside contacts with the jury is left largely to the discretion of the trial court. Id.; U. S. v. Khoury, 539 F.2d 441 (CA5, 1976).

In the present case a complete hearing was held on the outside communications to the jury and whether this contact had been harmful to the defendants. After the hearing the trial judge decided that the defendants had not been prejudiced by the remarks to some of the jurors. According to the trial judge the reasons for this conclusion were: the remarks did not relate to the evidence and did not indicate the Marshal's view of the evidence; the remarks were made in jest; and after the statements the jury deliberated for nearly three days. The lower court also found the actions of the Marshal's Service after learning of the incident were the result of commendable caution.

14. Factors to be considered in making this decision include the nature of the article, the circumstances surrounding its custody, and the likelihood of others tampering with it. U. S. v. Daughtry, 502 F.2d 1019 (CA5, 1974); U. S. v. Brown, 482 F.2d 1226 (CA8, 1973).

Because the record indicates that this contact with the jury was not an egregious breach of the jury's time-honored and much-needed privacy and isolation and because the trial court has wide discretion in this matter and exercised its discretion only after a thorough investigation and because there were substantial reasons for the trial court's decision, we find that the trial court did not abuse its discretion in refusing to grant a new trial because of improper statements to some jurors.

### Newly discovered evidence

In a separate, consolidated appeal defendants ask for reversal of the district court's denial of a second motion for new trial based on newly discovered evidence. Defendants contend that witness Zavala in a statement to the Houston news media contradicted testimony he had given at trial concerning the existence of an agreement between him and the prosecution promising no prison term if he testified against defendant. The trial court found that it had disposed of this contention at a hearing on an earlier motion for new trial. The denial of a motion for new trial is within the discretion of the trial court. *E. g., Montgomery Ward v. Duncan,* 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940); *Harris v. Whiteman,* 243 F.2d 563 (CA5, 1957), *rev'd on other grounds* 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958). This discretion was not abused.

The convictions of all defendants are AFFIRMED.