**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Leslie Marion PHILLIPS,
Defendant–Appellant.**

No. 79–5433.

United States Court of Appeals,
Sixth Circuit.

Argued July 7, 1980.

Decided Sept. 29, 1980.

As Corrected on Denial of Rehearing
Nov. 13, 1980.

Michael J. Hammons, Covington, Ky., for defendant–appellant.

Patrick H. Molloy, U. S. Atty., James E. Arehart, Asst. U. S. Atty., Lexington, Ky., for plaintiff–appellee.

Before EDWARDS, Chief Judge, WEICK and MARTIN, Circuit Judges.

WEICK, Circuit Judge.

Appellant Leslie Marion Phillips (Leslie) has appealed to this court from his conviction by a jury in the district court and sentence on five counts of a fourteen count joint indictment which charged him and his wife Melissa Ann Phillips (Melissa) with a conspiracy to assault with a deadly weapon two United States Marshals who were engaged in the performance of their official duties, in violation of 18 U.S.C. § 113(b); and with the substantive offenses of assault on Deputy Marshal Riffe; assault on Riffe

with intent to commit escape; aiding and inducing Melissa to assault Deputy Riffe with a deadly weapon; attempted escape; aiding and inducing Melissa to commit murder within the territorial jurisdiction of the United States and aiding and inducing Melissa to use a firearm in the attempt to commit an escape, in violation of 18 U.S.C. § 111; 18 U.S.C. § 113(b); 18 U.S.C. §§ 111, 2; 18 U.S.C. § 924(c) respectively.

The district court severed the trials of Leslie and Melissa and Leslie as tried before a jury which resulted in his conviction on all counts of the indictment with respect to the charges against him. The court merged Count 4 of the indictment with Count 8 and dismissed Count 12. The court sentenced Leslie to consecutive terms of imprisonment on the various counts as follows: Count 1 five years, Count 7 ten years, Count 8 ten years, Count 10 five years, Count 14 ten years, total forty years imprisonment.

On appeal, Leslie presents only the following issues for review:

1. Did the trial court err in refusing to delay trial until such time that Melissa Phillips could be available to testify?

2. Did the trial court err in refusing to strike certain jurors for cause as requested?

As we will point out, there is no merit in either of these issues. We do find merit in another issue shown by the record which we are required to consider as it involves plain error, namely, Melissa was mentally ill at the time the alleged offenses were committed and Leslie could not conspire with himself. We will therefore reverse on the conspiracy Count 1 and affirm on all of the substantive counts numbers 7, 8, 10 and 14.

## I

### The Facts

On the morning of October 2, 1979, Leslie was in the custody of United States Marshals James Carney and Larry Riffe, who were escorting him from the Kenton County, Kentucky, jail to the Federal Courthouse in Covington, Kentucky, to stand tri-al on criminal charges unrelated to the present case (an armed bank robbery prosecution, designated No. 77–24 in the district court.) Leslie was handcuffed and had a belly chain. In the entrance to the Federal Courthouse, Leslie and the marshals encountered Leslie's wife, Melissa. She drew a revolver from her purse, and pointed it at the trio. Leslie grabbed for the pistols of the marshals, but was unable to gain control of either weapon. Deputy Marshall Riffe grabbed Leslie, and Riffe and Leslie tumbled back out of the courthouse door. Both deputy marshals testified at the trial that, during this time, Leslie shouted to Melissa "shoot 'em, babe, shoot 'em." Melissa then opened fire upon the marshals; she fired several shots, and wounded both. Outside the entrance, on the front steps, Leslie wrestled with Riffe for Riffe's gun. Melissa, who had followed them out of the building, stood over them, holding her revolver. Kenny Duble, who was at the entrance of the courthouse at the time of the incident, testified that, while Leslie and Riffe were wrestling outside the entrance, Leslie shouted to Melissa, telling her to shoot the Marshal. Duble testified that Leslie yelled "Shoot 'em, baby," two or three times.

Deputy Marshal Carney, who briefly lost consciousness after being wounded in the courthouse vestibule, then exited the building and returned the fire, wounding Leslie in the shoulder. Melissa ran from the courthouse steps. Carney pursued her, and, with the assistance of local police, apprehended her.

A mistrial was declared in the trial of the bank robbery case, No. 77–24.

## II

The trial in the present case was scheduled to commence on December 3, 1979. On October 11, 1979, following a hearing on the Motion for a Mental Examination of Melissa, the district court granted the motion to determine her competency to stand trial. The United States, at hearing, expressed an objection to any delay in the December 3 trial date. On November 28, 1979, counsel

for appellant moved to continue the trial in the present case "on the grounds that Counsel has not had sufficient time to prepare this case with his client." District Judge Siler denied the motion the next day.

On the morning of December 3, 1979, with Leslie, his attorney, and counsel for Melissa in attendance, the District Court related that it had been orally advised that a psychiatrist was expected to be present the following afternoon to testify that Melissa was incompetent to stand trial. The United States Attorney indicated that the prosecution was ready to proceed with the appellant alone "because apparently there is no indication if and when Melissa would be available." The following exchange, between the Court, Michael J. Hammons, counsel for Leslie, and E. J. Walbourn, counsel for Melissa, who was the Federal Public Defender representing her, took place:

> MR. HAMMONS: Your Honor, again, I would restate to the Court that the defendant, Leslie Marion Phillips, wouldn't be ready for trial at this time. There are several problems. One, I have indicated to the Court last week that Melissa Phillips is potentially his only witness in the matter, particularly as to the conspiracy count and the three counts of aiding and abetting and inducing her to commit several crimes. Again, her testimony could very well clear Mr. Phillips. Evidence as to her mental state might also go toward clearing Mr. Phillips by her mental state as it was at the time of the occurrence. Again, she is potentially our best witness for evidence about her condition at the time. It may be evidence that would tend to clear him. Without that, without having the opportunity to talk to her, examine her psychiatric evaluation, diagnosis, I wouldn't be prepared.
>
> It's also further a matter, and, of course, I haven't had time and I won't. I don't believe if I have any opportunity to talk to her tomorrow and to sit in on this hearing, it's going to give me ample time really to evaluate situation by her.
>
> THE COURT: Well, she should be here tomorrow. Of course, it's up to Mr.

Walbourn as to whether—what his position would be, if she is declared incompetent and you want to put her on the stand. I just want all parties to be prepared to let me know what the test of competency is. We'll have to see if she is competent to be a witness under the thoughts of the psychiatrist.

Mr. Walbourn, do you know your position yet until you have talked to her as to whether you are waiting for her to be a witness in the case or would advise her against it, or what is your position?

> MR. WALBOURN: Your Honor, to be frank with the Court, I think that at this juncture, not having discussed the matter with my witness, it would be my advice at this point in time for her not to testify. However, I would think that this matter need be discussed fully with her and also an examination of what the psychiatric report detailed. I have not seen the report and I think it would be pure speculation to guess what is in that report. I think after I have examined that report and have talked with the doctor, I would be in a better position to advise the Court.
>
> THE COURT: Well, I don't want you to be in any hurry to announce ahead of time. I think she should be advised as to what her rights are. You and she will have to make that decision together. But I think that in view of the fact that she will be here tomorrow and will be amply available, equally to the U. S. and to the defendant, that we can go ahead. I think we have to also consider the problems, the policy that the Congress has made under the Speedy Trial Act to have trials as speedily as possible. And this one here is about—
>
> MR. HAMMONS: Two months.
>
> THE COURT: It's almost sixty days from the date of the arraignment. So I feel that severance should be granted here in view of the fact that Melissa Ann Phillips is expected to be declared incompetent, based on every indication that the Court has received from this psychiatrist. And I am sure if there was any way she

could be tried right now that the Government would probably prefer to have her tried at the same time as Mr. Phillips. But in view of the oral prognosis that we have received over the telephone, I think that is a matter that she may not be well for sometime.

MR. HAMMONS: Well, Your Honor, the problem with that is that if she is not well, she may not be in a position to waive her rights and to take the stand, the right of self–incrimination.

THE COURT: That's right.

MR. HAMMONS: Again, if she would be—she could be potentially his witness or a witness in Mr. Phillips' behalf and possibly his only witness. I think it would be denying him a right to bring witnesses forward in his behalf, the Sixth Amendment right to a fair trial, if we don't get the time to evaluate that situation.

THE COURT: You will have ample time. If it looks like we have problems with that, we will stop long enough to give you time. I think it's really a matter that's pretty simple, that she is either incompetent or competent. And if she's incompetent, it depends on the prognosis. If they say she is expected to be incompetent for a year, why, I don't think there is any way on earth to say that he has been denied his rights to call any witnesses because if the person is insane for a period of time, it's just impossible to use that person. And she may not be able to waive any right of self–incrimination. And that's going to be a matter for her and her lawyer because she may have a defense which is entirely inconsistent with her own husband's defense.

### III

On the afternoon of December 4, 1979, a hearing was held, with Melissa and her attorney, along with appellant and counsel, present, to determine Melissa's competency to stand trial. Judge Siler announced that "the competency to stand trial is the first issue, the competency as a witness the secondary." Dr. Michael McNeer, a psychia-trist, testified that he had examined Melissa and had diagnosed schizophrenia paranoid type, which diagnosis was confirmed by means of psychological tests. Dr. McNeer testified that Melissa was incompetent to stand trial. When asked for a prognosis as to when she might be able to stand trial, he responded:

I am certainly not able to answer it with any specific degree of accuracy. I think the patient should receive intensive psychiatric treatment at an inpatient facility. Some improvement should take place with adequate medication over an adequate time space. I would consider a period of three to six months as an estimate as to when she might be reevaluated to determine if she is competent.

Dr. McNeer also stated that Melissa could not, at the time, make any decision voluntarily or competently on her own. He estimated that it would be at least three months before she would begin to improve significantly, because of the necessity of achieving a build–up of antipsychotic medication in her system, "if she is going to improve." Dr. McNeer was of the opinion that Melissa did not have the ability to understand the nature of the hearing.

On the basis of Dr. McNeer's testimony, Judge Siler found Melissa incompetent to stand trial, and he ordered that she be committed to the custody of the Attorney General until she became mentally competent to stand trial or until the pending charges against her were disposed of according to law. The focus of the hearing then shifted to Melissa's competency as a witness. Dr. McNeer testified that Melissa could not give a correct account of matters she had seen, heard, or participated in if she were called as a witness. He stated that "she would certainly see (events) in a different light than a person who is not psychotic." In response to a question by Leslie's counsel, as to whether Dr. McNeer had "any idea how long it might be before" the treatment and medication would "affect her so that she would be able to understand the rights that she has and understand the oath and be able to testify as a witness," Dr. McNeer testified:

Well, schizophrenia is a variable disease. The prognosis is certainly not the same in every individual. She may never be able to. There is that chance I think with appropriate treatment that in a period of three to six months she should certainly be reevaluated as to her competency. I could not give you a specific date. I cannot say that she will improve. I cannot say to what extent she will improve. But she certainly has a good chance of improving with the appropriate treatment. And I would say that in–patient treatment on the order of at least three months would be indicated.

Melissa Phillips was then called to the witness stand. She testified that she understood she was in a courtroom in Covington. However, she said she did not understand what had happened, nor did she remember. She testified she would not understand what she was being asked about if she were called as a witness. She told the Court that it was only from television and newspaper accounts that she knew what she was charged with doing.

The District Court, relying upon the psychiatric testimony and its own observation of Melissa, found that she was not competent to be a witness. The Court then addressed Melissa's attorney:

THE COURT: . . . I don't know whether you would want to assert her rights under the Fifth Amendment on behalf of the witness, Mr. Walbourn? . . . But since she is not able to assert that right, I would leave that up to you. Assuming that she was competent, what would be your position on that?

MR. WALBOURN: Your Honor, I would be of the opinion that I–part of my representation of this defendant and as my client is to legally protect every right she has. If she were incapable of asserting a right she would have, I would believe that my duty would lie to fully protect any rights. And to directly answer the question, yes, I would assert her Fifth Amendment right on her behalf.

THE COURT: All right. The Court finds that she is not competent to testify, but in the alternative counsel has a right to assert Fifth Amendment rights in view of what Dr. McNeer has testified to.

MR. WALBOURN: Your Honor, I would add that I would assert that right because of her incompetency. Were she competent, I don't believe we would reach that question.

THE COURT: All right. I see it's a kind of catch twenty–two situation, but the Court finds that she could not testify in this case.

Thereafter, counsel for the appellant requested and was granted a brief recess to enable him to discuss the matter with Dr. McNeer.

## IV

At trial, there was evidence that Melissa had visited Leslie in the Kenton County Jail where he was confined on September 19, 26, and 30, 1979. There was also evidence that, on October 2, Melissa was in possession of a handcuff key, and she had a pair of pliers in her purse. Further, on October 2, a suitcase was seized from the automobile belonging to Melissa; the suitcase contained numerous articles of men's clothing, including several pair of trousers, several shirts, a jacket, and socks. The evidence was concluded on December 5. The District Court, pointing to the meetings between appellant and Melissa, and the fact that she had a handcuff key, pliers, and the clothing as evidence of a possible conspiracy between the two, denied appellant's Motion for Judgment of Acquittal.

The appellant waived opening statement, and did not offer any witnesses in defense. On the morning of December 6, the jury retired to deliberate. After approximately a half day of deliberation, the jury returned a verdict of guilty on all counts against the appellant.

## V

■ The primary issue in this appeal is whether, as appellant argues, the trial court erred in denying appellant's request to continue the trial until such time as Melissa could be available to testify.

Appellant contends that the district court, by depriving him of the opportunity to have Melissa testify for him, precluded him from exercising his constitutional right to present witnesses to testify on his behalf. Appellant made no proffer as to Melissa's testimony if she were called as a witness. He could not very well state what an insane person would testify to. Appellant emphasizes that, on the date of trial, when the court ordered a severance because Melissa was not available, his counsel informed the court that appellant was not ready to proceed without Melissa. Defense counsel advised the Court generally that Melissa was the only witness who knew whether there had been a conspiracy or plan for escape; that she was the only one who could testify that appellant did not conspire to escape; this was not a truthful statement in view of the evidence of the shootings and her conduct in taking articles to the jail listed in IV herein; and that evidence of her mental condition was relevant to show whether she was mentally capable of planning or conspiring to commit a crime. The trouble is that such evidence was already before the court. Appellant stresses that Melissa was not available to the defense prior to trial. Though acknowledging that the trial court is vested with the discretion of deciding whether to grant a delay in trial, appellant submits that the court below abused its discretion, and thereby denied him his right to a fair trial.

The government asserts that the trial court, in assessing whether a general continuance should be granted based on the unavailability of a prospective witness, must examine the particular circumstances of each case. The government explains that the court below construed the defense statement that appellant was not ready to proceed to trial because Melissa was unavailable, as a motion for continuance. The government submits that the motion was properly denied because of: the incapability of determining when Melissa would be available as a competent witness; the lack of a showing that if Melissa testified, her testimony would or could be favorable to appellant. The government asserts that

Melissa's attorney indicated that he would invoke the Fifth Amendment on her behalf until she was deemed competent, and, at that time, he would advise her to invoke her privilege. Urging that the trial court's denial of the continuance should not be disturbed in the absence of an abuse of discretion, the government submits that the court below reached the correct decision by determining: the unavailability of the witness due to mental incompetency; the unlikelihood that the witness would be available within a reasonable time; the unlikelihood that the witness would provide favorable testimony for appellant; and the unwillingness of the witness to give any testimony at all.

It is well–settled that "the ruling on a motion for a continuance is within the sound discretion of the District Court and will not be overturned absent a showing that the ruling constituted an abuse of discretion." *United States v. Faulkner*, 538 F.2d 724, 729 (6th Cir.), *cert. den.*, 429 U.S. 1023, 97 S.Ct. 640, 50 L.Ed.2d 624 (1976). See *United States v. Collom*, 614 F.2d 624, 634 (9th Cir. 1979); *United States v. Jones*, 612 F.2d 453, 455 (9th Cir. 1979); *United States v. West*, 607 F.2d 300, 305 (9th Cir. 1979); *United States v. Albert*, 595 F.2d 283, 286 (5th Cir. 1979); *United States v. Siegel*, 587 F.2d 721, 728 (5th Cir. 1979); *United States v. Pelton*, 578 F.2d 701, 706 (8th Cir.), *cert. den.*, 439 U.S. 964, 99 S.Ct. 451, 58 L.Ed.2d 422 (1978); *United States v. Miller*, 573 F.2d 388, 394 (7th Cir. 1978); and *United States v. Miriani*, 422 F.2d 150, 154 (6th Cir.), *cert. den.*, 399 U.S. 910, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970).

"Whether a trial court has abused this discretion is decided on a case–by–case basis in light of the circumstances." *Albert, supra.* "No firm rules can be articulated as to when a continuance is required," *United States v. Haldeman*, 559 F.2d 31, 83 (D.C. Cir. 1976), *cert. den.*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Rather, "in ruling on motions for continuances trial judges must carefully evaluate and then balance the defendant's need for the continuance against the Government's interest in going forward." *Id.*

The *Haldeman* Court suggested "some of the factors that should be considered by district judges in evaluating the competing interests." *Id.*

> First, the court must assess the likelihood—as it appears from the defendant's motion for a continuance, his supporting papers, and from anything else in the record—that defendant will be able to and will produce the missing evidence if the continuance were granted. Second, the court must assess the likelihood—again based primarily on defendant's showing—that the evidence will be favorable to the defense and, if so, that it will be significant. Third, the court must determine whether the defendant acted with diligence in attempting to secure the missing evidence in time for trial. Finally, the court should consider the length of the continuance being requested and the burdens that would be placed on the Government and the court if the request were granted. 559 F.2d 83–84.

The Fifth and Ninth Circuits have discussed the criteria for ruling on a motion for continuance in the specific context of a continuance sought to secure the testimony of a witness. In *Siegel, supra* at 728, the Fifth Circuit explained:

> Generally, the person moving for a continuance must show: that due diligence had been exercised to obtain the attendance of the witness; that substantial favorable testimony would be tendered by the witness; that the witness was available and willing to testify; that the denial of a continuance would materially prejudice the defendant.

In *United States v. Sukumolachan*, 610 F.2d 685, 687 (9th Cir. 1980), appellant's co-defendant, Hiller, had entered a plea of guilty, and was to be sentenced after the date set for appellant's trial. Appellant requested a continuance on the ground that he wanted to call Hiller as a witness, but Hiller would not testify before he was sentenced. The Court of Appeals stated:

> A continuance may be proper under such circumstances upon a showing that if the motion were granted: (1) the codefend-ant would be called; (2) he would in fact testify; and (3) the testimony would be favorable to the requesting defendant.

This Court must thus undertake a three-part analysis: when, if ever, would Melissa be available to testify?; if she were competent and available to testify, was it likely that she would waive her Fifth Amendment privilege and choose to testify?; and, if she would testify, was it likely that Melissa's testimony would be favorable to the appellant?

With respect to the first prong—when, if ever, Melissa would be available to testify? —the Court below was confronted with psychiatric testimony which clearly indicated that Melissa would require at least three months of in-patient treatment, that it would be at least three months before she would begin to improve significantly, and that reevaluation would be appropriate in a period of three to six months. It must be emphasized that Dr. McNeer, when asked for a prognosis, gave responses such as "I am certainly not able to answer it with any specific degree of accuracy," and ". . . schizophrenia is a variable disease." He stressed that "intensive psychiatric treatment at an inpatient facility" and "adequate medication" were necessary for her recovery. Dr. McNeer cautioned, however, that "I could not give you a specific date. I cannot say that she will improve. I cannot say to what extent she will improve." He also warned that "she may never be able to" understand the oath and testify as a witness. In light of the foregoing, as well as the trial court's own observation of Melissa, it was certainly reasonable for the district court to conclude that Melissa would be unavailable to testify for at least several months, and that there was a real possibility that she would never be competent to testify. The Court was confronted with a very indefinite prognosis, with no firm indication as to when, if ever, Melissa would be competent to be a witness. See, e. g., *Albert, supra* at 287; *Sukumolachan, supra* at 687.

The second prong is whether it was likely that Melissa, if competent and available to

testify, would forego her privilege against self–incrimination and choose to testify on behalf of the appellant, despite the fact that she, too, faced trial. During hearings on both December 3 and 4, the Court specifically inquired of Melissa's counsel as to whether Melissa would take the stand if she were competent to do so. Though counsel's responses were hardly unequivocal, it was very reasonable for the trial court to conclude therefrom that Melissa would assert her Fifth Amendment privilege. There was clearly no indication by Mr. Walbourn to the contrary. Indeed, after the Court asked "Assuming that she was competent, what would be your position on that?", Mr. Walbourn stated ". . . And to directly answer the question, yes I would assert her Fifth Amendment right on her behalf."

Finally, with respect to whether Melissa's testimony would be favorable to appellant, little if anything was presented to the Court below which would indicate that her testimony would be favorable. Indeed, just as with regard to the second prong of the analysis, only "possibilities" and speculation were offered to the trial court. Counsel for appellant told the Court that "Melissa Phillips is potentially his only witness in the matter .... her testimony could very well clear Mr. Phillips." This seems to be very improbable as the testimony indicates that Leslie was shouting to Melissa urging her to shoot the marshals. Counsel added that "she could be potentially his witness or a witness in Mr. Phillips' behalf and possibly his only witness."

The trial court must have the benefit of more than "conclusory assertions," *Albert, supra* at 286, if it is to rule favorably on a motion for continuance. In *Sukumolachan, supra*, the trial court denied the motion for continuance because defendant had been unable to establish to the court's satisfaction that his co–defendant, Hiller, who was awaiting sentencing following a plea of guilty, would testify and that his testimony would be favorable. Defendant's showing in support of the motion consisted of an affidavit of his attorney stating that counsel was "informed" that after Hiller was sentenced he "will be available and willing to testify," and that it was counsel's "belief" that Hiller would testify to certain facts favorable to his client's defense. The Court of Appeals said:

> In the absence of the potential witness's own affidavit, however, the affidavit of defense counsel should have stated with particularity the grounds for believing Hiller would testify and that his testimony would be favorable. Defense counsel's affidavit failed to do so. Absent such a showing, counsel's assertion that a continuance would provide exculpatory material was 'conjecture', as the trial court found. Denial based on such a finding will not be reversed absent clear evidence of an abuse of discretion.

See also *Siegel, supra* at 728.

Therefore, it is clear that, under the three–step analysis, the court below did not abuse its discretion in denying the continuance. Consideration of two additional criteria also support this conclusion.

First, as suggested in *Haldeman, supra*, and *Siegel, supra*, the party moving for continuance must demonstrate due diligence on its part. In *Albert, supra* at 286, the Fifth Circuit declared that "A request for a continuance should be advanced with all specificity and detail feasible under the circumstances *and presented as early as possible.*" (Emphasis added.) The Court of Appeals in *Albert* emphasized that "Although Hosford (the prospective defense witness) suffered a stroke on December 18, 1975, the motion for continuance was not filed until February 11, 1976, only six days before trial was set to begin." In the case sub judice, although it was not formally determined until December 4 that Melissa would not be available to testify, appellant and his attorney had known from October 10—when the hearing on her mental competency was held and the motion for examination granted—that there were serious doubts about Melissa's competency. Yet appellant did not raise his unreadiness to proceed because of Melissa's unavailability until December 3, the day trial was scheduled to begin. (Appellant's November 28

motion for continuance, which was also relatively tardy, did not refer to Melissa's status, but merely asserted that "counsel has not had sufficient time to prepare this case with his client.") Appellant, knowing his own view of the significance of Melissa's testimony, could have certainly sought a continuance during October or November. He could have at least asked the court to grant, if necessary, a continuance between the time the report on Melissa's mental competency was received, and the commencement of trial. It should not be incumbent upon the trial court to anticipate the defenses which will be raised, or the importance of a particular witness; the court must depend upon the parties to apprise the court of such matters, and of the possible contingencies which may arise. Furthermore, trial courts must exercise some management and control over their calendars and dockets. Thus, especially since the jury panel was present and witnesses had been called, the court below was well within its discretion in denying the continuance.

The second factor to be considered is "whether (the evidence) could be obtained through other witnesses or other sources." *Albert, supra* at 287. As the Fifth Circuit explained, ". . . the possibility of these alternative sources for the testimony Hosford would have given may be taken into account in determining whether a delay was justified." *Id.* Here, appellant could have called Dr. McNeer to testify about Melissa's mental state before and at the time of the shooting. Indeed, that option was discussed at pre–trial hearings, but appellant waived calling Dr. McNeer. The examining psychiatrist's expert opinions about Melissa's mental condition at the time of the apparent escape attempt almost surely would have been better evidence on that question than Melissa's own testimony.

Although it may sometimes seem preferable, particularly in hindsight,[1] to say that the trial should have been continued, it

cannot be said, under the circumstances presented to the district court, that the trial court here abused its discretion in refusing to grant the continuance.

## VI

### The Conspiracy Count

■ The indictment alleged only a conspiracy between Leslie and his wife Melissa. No proof was offered to the effect that any other conspirator was implicated. The government never made a claim that any other conspirators were involved. The trouble here is the uncontroverted proof that Melissa was mentally ill at the time she is alleged to have conspired and therefore was incapable of committing the offense. She did not have the capacity to enter into an agreement.

In *United States v. Moss*, 591 F.2d 428, 434 (8th Cir. 1979), the court stated:

> Obviously, a man cannot conspire with himself. . . . The essence of any conspiracy is an agreement between two or more individuals to commit a crime.

In *United States v. Williams*, 503 F.2d 50, 54 (6th Cir. 1974), we stated:

> Where all other alleged co–conspirators are acquitted, the conviction of one person for conspiracy will not be upheld.

In *United States v. Fredericks*, 586 F.2d 470, 474 n. 2 (5th Cir. 1978), *cert. den.*, 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979), the court stated:

> The essential elements of a criminal conspiracy are an agreement by two or more persons to commit an offense against the United States attended by an overt act by one of them in furtherance of the agreement.

In *United States v. Brown*, 547 F.2d 438, 442–43 n. 2 (8th Cir.), *cert. den.*, 430 U.S. 937, 97 S.Ct. 1566, 51 L.Ed.2d 784 (1977), the court stated:

> pellants tell us that Hosford would have been able to testify in July 1976, but this is with the benefit of hindsight." 595 F.2d at 287, n. 5.

---

1. At oral argument, counsel for the appellant indicated that Melissa was declared competent in June, 1980, and that her trial has been scheduled. Similarly, the Court in *Albert* noted "Ap-

In passing upon a conspiracy case, the jury must find (1) an agreement, (2) a combination of two or more persons, (3) an unlawful purpose, and (4) that at least one of the conspirators committed an overt act in furtherance of the conspiracy . . . . Failure of proof of any essential element will result in acquittal.

In *United States v. Fleming*, 504 F.2d 1045, 1055 (7th Cir. 1974), the court stated:

. . . it is clear that a conspiracy requires at least two participants, and it has repeatedly been said that the acquittal of all but one of the alleged conspirators should operate as an acquittal of that defendant as well.

*Cf. United States v. Suarez*, 608 F.2d 584, 586 (5th Cir. 1979); *United States v. Butler*, 494 F.2d 1246, 1249 (10th Cir. 1974); *United States v. Rose*, 590 F.2d 232 (7th Cir. 1978), *cert. den.*, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979).

The burden of proof was upon the government to prove every ingredient of the offense of conspiracy. *Patterson v. New York*, 432 U.S. 197, 215, 97 S.Ct. 2319, 2329, 53 L.Ed.2d 281 (1977). We are of the opinion that the court's findings of insanity are supported by substantial evidence and are not clearly erroneous.

The judgment of conviction entered against Leslie for conspiracy is therefore reversed as he could not conspire with himself.

## VII

The Court did not err in refusing to strike certain jurors for cause as requested in the selection of the jury. Eleven jurors were impanelled on December 3; selection was resumed and completed on the morning of December 4. During voir dire, nineteen prospective jurors indicated that they had been exposed to pre-trial publicity about October 2 Courthouse shooting incident. The Court conducted individual voir dire as to each of the 19. Several of the 19 recalled the incident as an escape attempt. All of the prospective jurors assured the court that they could set aside anything that they had read or heard about the case, could render a verdict based solely upon the evidence presented at trial, and could be fair and impartial to both sides. Counsel for appellant moved to strike juror Wilson for cause, on the ground that Wilson had indicated that he still held the opinion that it was an apparent escape attempt. The Court denied the motion because Wilson said that he could be fair and impartial.

At the conclusion of jury selection on December 3, counsel for the appellant stated:

I would . . . challenge each of the jurors that did come into the room and indicated that they had read something about this matter. Even though it is conceivable that the person may not read the news or hear about it, I think it is inconceivable of people who saw it in the newspaper or who subscribe to the newspaper and saw it in the headlines and were exposed to the coverage which was continuous and extensive, both on the news accounts and in newspapers, and it is inconceivable that they wouldn't form an opinion and bring that opinion into the courtroom with them when they listen to the testimony. And for that reason, we would move for the record to strike the cause all the individuals, the veniremen, for cause in that matter.

In denying the motion, the Court said:

I don't think that exposure to the media to any extent disqualifies a juror because if we did, then we would have all the jurors who live in an area with extensive media coverage to be disqualified in a case of any notoriety I think the test is what we have asked them and I think they are all of the opinion that they could be fair and impartial. And the Court will have to accept their statement to that effect. To do otherwise, would be to discourage the use of media coverage of court events, and I don't think that that's ever been the intent of the Court to do that.

In his brief on appeal appellant reiterates his position "that it is inconceivable that those jurors who had read or heard about

this case would not have formed an opinion about it, and that that opinion, once formed, would not have affected their judgment in the trial." [2]

The Supreme Court, in *Irvin v. Doud*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961), declared:

> It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

This Court has recently followed the *Irvin* standard in *United States v. Johnson*, 584 F.2d 148, 154 (6th Cir. 1978), *cert. den.*, 440 U.S. 918, 99 S.Ct. 1240 (1979), and in *Goins v. McKeen*, 605 F.2d 947, 951 (6th Cir. 1979). In *Goins*, the Court emphasized that "the mere exposure to publicity is not sufficient, standing alone, to give rise to a presumption that the defendant will be deprived of his right to be tried by fair and impartial jurors."

This Court has examined the various newspaper articles about this case which are contained in the record. Appellant submitted said clippings in support of his Motion to Transfer the trial in the armed robbery case, No. 77–24. (Appellant did not seek to transfer the matter sub judice, designated No. 79–41; rather, appellant's counsel expressly indicated that he preferred to

keep the trial in Covington.) The newspaper articles submitted were "neither . . . inherently prejudicial nor . . . unforgettable . . . The overwhelming bulk of the material submitted, . . . consists of straightforward, unemotional factual accounts." *Haldeman, supra* at 61.

More importantly, the record reveals that the voir dire was conducted with utmost care, and produced answers from the prospective jurors which clearly meet the standard articulated in *Irvin*, *Johnson*, and *Goins*. The trial court made thorough inquiry "into the exposure of veniremen to prejudicial pre–trial publicity." *Johnson*, *supra* at 155. Here, as in *Johnson*, first, "all prospective jurors were asked as a panel whether they had read or heard anything about the case." Those who were asked to identify themselves; they were separated from the other veniremen, and were then individually questioned at length. The individual voir dire, conducted by both the Court and counsel, was undertaken to ascertain the source, extent, and content of the prospective juror's knowledge about the case, as well as the existence of any partiality.

Voir dire revealed that nineteen of the prospective jurors had been exposed to some form of pre–trial publicity concerning the case. Of these, however, few recalled more than generalities about the shooting at the courthouse. A few of the prospective jurors indicated during the individual voir dire that they had formed some opinion about the case, but they, too, told the Court that they could set aside any opinions and anything they had read or heard about the case, and render a fair and impartial verdict based solely on what was presented to them at trial. Though given full opportunity to examine each juror who was subject to the individual voir dire, appellant moved to strike only one specifically identified potential juror—Wilson—for cause due to his prior knowledge.

**2.** Appellant does not refer to his motion to strike prospective juror Wilson. Apparently, appellant is renewing his blanket challenge to

all those exposed to information about the case.

In the instant case, just as in *Johnson*, "all veniremen not otherwise dismissed for cause assured the court that their prior knowledge would in no way affect their ability to render a fair and impartial verdict."

In light of the foregoing, it is clear that the Court below did not commit the errors which the appellant has assigned.

### Conclusion

The judgment of conviction is reversed on Count 1 of the indictment charging conspiracy. It is affirmed on all other counts charging the substantive offenses being Counts 7, 8, 10 and 14.