**William ANDREWS, Petitioner,**

**v.**

**Kenneth V. SHULSEN, Warden of the Utah State Prison, and David L. Wilkensen, Attorney General of the State of Utah, Respondents.**

**Civil. No. C–78–0462W.**

United States District Court, D. Utah, C.D.

Dec. 13, 1984.

Timothy K. Ford, Seattle, Washington, Parker M. Nielson, Salt Lake City, Utah, for petitioner.

Earl F. Dorius, David J. Schwendiman, Asst. Attys. Gen., Salt Lake City, Utah, for respondents.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This action comes before the court on a petition for a writ of habeas corpus filed by William Andrews pursuant to 28 U.S.C. § 2254. The court heard oral arguments on the issues presented by the petition on August 10, 1984, Timothy K. Ford appearing for petitioner and Earl F. Dorius and David J. Schwendiman appearing for respondents. After carefully considering the oral arguments, memoranda, pertinent authorities and the entire record in this matter, the court renders the following decision and order.

### I. BACKGROUND

The court will begin with a brief recitation of the procedural and factual background.[1] Petitioner and Pierre Dale Selby, aka Dale S. Pierre ("Selby"), were convicted of three counts of first degree murder and two counts of aggravated robbery for the killings of three people in the course of a robbery at the Hi Fi Shop in Ogden, Utah. After a bifurcated sentencing proceeding, the Second District Court of the State of Utah sentenced petitioner and Selby to death.

The evidence presented at the guilt phase of petitioner's trial reflects a brutal and torturous detention, robbery and murder, which left three people dead and two seriously injured. On the evening of April 2, 1974, petitioner and Selby took captive three Hi Fi Shop employees to facilitate the robbery of stereo equipment. Stanley

---

1. For a full discussion of the facts, see *State v. Pierre*, 572 P.2d 1338 (Utah 1977), *reh'g denied*, 576 P.2d 857 (Utah), *cert. denied*, 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978), and *State v.* *Andrews*, 574 P.2d 709 (Utah 1977), *reh'g denied*, 576 P.2d 857 (Utah), *cert. denied*, 439 U.S. 882, 99 S.Ct. 220, 58 L.Ed.2d 192 (1978).

Walker, assistant manager of the store in his early twenties, Michelle Ansley, a nine-teen-year-old part-time bookkeeper and cashier, and Cortney Naisbitt, a seventeen-year-old relative of the store's owner, were forced at gunpoint into the store's basement by petitioner and Selby and were bound hand and foot.

Stanley's father, Orren Walker, became concerned when Stanley did not arrive home for dinner that evening and went to the Hi Fi Shop to check on his son. As Orren entered the store, petitioner and Selby confronted him with guns and forced him down the stairs to the basement. Orren there saw the three young people bound on the floor pleading for their lives. Selby attempted to force Orren to give the young people a drink, which later proved to be a liquid drain cleaner containing sodium hydroxide. When Orren refused, petitioner placed a gun at Orren's head threatening him. Petitioner and Selby then tied Orren's hands and feet and placed him on the basement floor by the others.

At about 8:00 p.m., Carol Naisbitt went to the Hi Fi Shop to look for her son Cortney after he had failed to return home from an errand. Petitioner and Selby captured Mrs. Naisbitt at gunpoint, bound her and placed her next to her son.

Eventually, petitioner poured and Selby caused each of the five victims to drink the liquid drain cleaner. Orren Walker, one of the two survivors, let the chemical slowly drain unnoticed out of his mouth. Apparently to ensure that the caustic liquid had its desired effect, the assailants covered each victim's mouth with tape.

Finally, Selby methodically shot each of the victims in the head. First, Carol and Cortney Naisbitt were shot. Next, Selby's bullet narrowly missed Orren Walker on his first attempt. Stanley Walker was then shot and Selby's second shot at Orren struck him in the head. After leaving for a brief time, Selby untied Michelle Ansley, who had not been shot, took her to a back room and raped her.

Michelle was returned to her place on the floor by the others and was herself shot in the head by Selby. Stanley was then shot a final time. After Selby later tried to discern if Orren was dead, he attempted to strangle Orren with an electrical cord and kicked a long ballpoint pen deep into Orren's ear.

Orren feigned death throughout the ordeal and somehow managed to survive the strangulation attempt by tensing his neck muscles. Michelle and Stanley were dead at the scene; Carol Naisbitt died enroute to the hospital; Cortney survived, but was hospitalized for months and suffered serious permanent injuries.

Orren Walker gave his eye witness testimony of the events, identifying petitioner and Selby as the assailants. Orren further testified that petitioner left the Hi-Fi Shop before any of the fatal shots were fired by Selby and that he did not see petitioner again that night. In addition to Orren's account, witness after witness corroborated his testimony and implicated petitioner and Selby.[2]

---

**2.** For example, one witness testified that he had overheard petitioner state two months prior to the crime that someday he would like to rob a "Hi Fi Shop" and would kill anyone who got in his way. R. T-9, at 1549. Two witnesses saw petitioner and Selby together in the Hi Fi Shop two days prior to the crime writing down prices and looking over the entire store, including the back stairs. *Id.* at 1578–80, 1588. Selby rented a storage locker the day before the crime in which the stolen stereo equipment, a bottle of liquid Drano, a cup, and personal items from the Hi Fi Shop were found.

Several witnesses saw petitioner and Selby in or near the Hi Fi Shop on the evening of the robbery. One witness saw petitioner's blue van backed up to the rear of the shop and two black men passing stereo equipment into it. R. T-11, at 1828–30. Purses, wallets and other personal effects of the victims were found in a dumpster outside of petitioner's and Selby's barracks at Hill Air Force Base. R. T-12, at 2121–29, 2136–38.

A search of Selby's room the day after the crime yielded a copy of the storage locker rental agreement signed by Selby and articles from the Hi Fi Shop. R. T-14 at 2467, 2473–74. Orren Walker's watchband, items from the Hi Fi Shop, a note referring to the storage locker and surgical gloves were found in petitioner's room. R. T-15, at 2582–88; T-17, at 3053–55, 3096. Orren Walker testified that he had heard sounds

After a lengthy trial, petitioner and Selby were found guilty of three counts of first degree murder and two counts of aggravated robbery. Another co-defendant in the case, Keith Roberts, was found guilty of two counts of aggravated robbery, but the jury was unable to reach a verdict as to Roberts on the first degree murder charges.

A separate sentencing hearing was conducted pursuant to Utah's then recently enacted capital sentencing statute. *See* Utah Code Ann. § 76-3-207 (1973). At that phase of the proceeding, the State introduced Andrews' military records, prior criminal history and testimony indicating that during the prior ten years, ten persons serving life sentences at the Utah State Prison had been released. Evidence was also presented that the average term of those who had been released was thirteen years, one month, and that of the ten released, three thereafter committed other murders.

Petitioner presented expert testimony that capital punishment is not a deterrent. Further, a former prison chaplin presented a historical overview of capital punishment, and stated that biblical text does not support the death penalty. Andrews testified concerning his background, family circumstances, prior criminal history and education.

After receiving sentencing instructions and deliberating, the jury reported a unanimous agreement to impose the sentence of death. On November 27, 1974, the court sentenced petitioner and Selby to death by shooting pursuant to Utah law.

Petitioner challenged his conviction on direct appeal, *see State v. Andrews,* 574 P.2d 709 (Utah 1977), *reh'g denied,* 576 P.2d 857 (Utah), *cert. denied,* 439 U.S. 882, 99 S.Ct. 220, 58 L.Ed.2d 194 (1978), and in collateral proceedings in the state courts, *see Andrews v. Morris,* 607 P.2d 816 (Utah), *cert. denied,* 449 U.S. 891, 101 S.Ct. 254, 66 L.Ed.2d 120 (1980). Petitioner then filed this federal habeas corpus action claiming that several constitutional errors were committed in his state trial and that the Utah capital sentencing laws are unconstitutional in various respects. Respondent moved to dismiss the petition on January 6, 1981. On June 16, 1981, this court entered a preliminary order granting a limited evidentiary hearing on the alleged "inherently prejudicial atmosphere in the trial in this case" and "the alleged arbitrary and discriminatory application of the death sentence in Utah." Additionally, the court denied an evidentiary hearing in other of the areas raised by petitioner. Preliminary Order at 10 (June 16, 1984).

On September 21, 1981, the Utah Supreme Court decided *State v. Wood,* 648 P.2d 71 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982), changing the capital sentencing standard under Utah law from the standard applied in this case. Prior to the scheduled evidentiary hearing on the limited issues stated above, this court entered an order staying these proceedings to allow petitioner to make appropriate application for relief to the Utah Supreme Court based on the *Wood* decision. On November 16, 1983, the Utah court entered a decision refusing to apply the *Wood* sentencing standard retroactively to petitioner. *See Andrews v. Morris,* 677 P.2d 81 (Utah 1983). Because petitioner's state remedies on that issue had then been exhausted,[3] this court ordered that the parties submit supplemental memoranda on all issues presented by the petition before this court.

---

like surgical gloves coming from the assailant's direction during the crime. *Id.* at 3094–95.

Petitioner and Selby later gave a stereo unit to a girl to "hold" which was identified as stolen from the Hi Fi Shop and contained Orren Walker's watch. R. T–13, at 2323–25; T–14, at 2427–28; T–16, at 2940; T–17, at 3096–97. Three weeks prior to the crime, Selby was seen at the movie "Magnum Force" a scene from which depicts a pimp pouring Drano down a prostitute's throat to kill her. R. T–10, at 1614–15.

**3.** The parties stipulated that petitioner's failure to seek review of the November 16, 1983 decision of the Utah court by certiorari to the Supreme Court would not constitute a waiver of any federal claims.

## II. DISCUSSION

Petitioner raises seven claims in his second amended petition which he argues justify federal habeas corpus relief: (1) denial of a fair and impartial jury trial; (2) application of an unconstitutional death penalty statute; (3) arbitrary and discriminatory imposition of the death penalty; (4) arbitrary and irrational failure by the Utah Supreme Court to apply the *Wood* standard retroactively in this case; (5) disproportional application of the death penalty contrary to *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); (6) application of a method of execution in violation of the First Amendment; and (7) imposition of cruel and unusual punishment in violation of the Eighth Amendment. Andrews has moved for an evidentiary hearing on all of his claims. For the reasons discussed below petitioner's claims involve purely legal issues or for other reasons do not require a federal evidentiary hearing. The portion of the preliminary order granting such a hearing must therefore be vacated. The court will discuss each of petitioner's claims.[4]

### A. *Fair and Impartial Jury Trial*

Petitioner Andrews first claims that he was denied his Sixth and Fourteenth Amendment right to a fair and impartial jury trial as a result of extensive pretrial publicity and community prejudice, a hostile trial atmosphere evidenced by an improper communication with jurors, and the improper release of the jurors into the community during the trial and between the guilt and sentencing phases of the trial. Venue of the trial was changed from Weber County to Davis County, Utah; however, petitioner contends that a fair trial could be obtained only by a further change of venue, a continuance of the trial or sequestration of the jury, none of which were granted by the trial court. Further, Andrews contends that under *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), this court must conduct an evidentiary hearing on this claim.

#### 1. *The Need for an Evidentiary Hearing*

The Supreme Court in *Townsend* delineated six particularized circumstances that warrant a federal evidentiary hearing:

If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

372 U.S. at 313, 83 S.Ct. at 757. Andrews asserts that the first and fifth circumstances are present here as to his claim of denial of an impartial jury because certain facts were not resolved by or brought before the Utah courts.[5] The court disagrees.

Although every conceivable fact concerning the impartiality of the jury may not be in the record, the trial court and the Utah Supreme Court conducted full and fair hearings within the meaning of *Townsend* at which the material facts were ade-

---

**4.** Respondents have raised several arguments that many of petitioner's claims have been waived or are barred by procedural default under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The court concludes, however, that all of the claims were either properly preserved and ruled upon by the state courts or allege no deprivation of a constitutional right. *See Engle v. Isaac,* 456 U.S. 107, 120 n. 19, 102 S.Ct. 1558, 1567 n. 19, 71 L.Ed.2d 783 (1982) ("If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inap-

plicable. It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts."). The court will therefore address the merits of each claim.

**5.** The first and fifth circumstances have been codified in the habeas corpus statute. There they serve to rebut the presumption that state factual findings are correct. *See* 28 U.S.C. § 2254(d)(1)(3); *Thomas v. Zant,* 697 F.2d 977, 980–986 (11th Cir.1983).

quately developed. The facts concerning the scope and extent of pretrial publicity were presented to the trial court in the form of exhibits of the most detailed and concentrated media accounts.[6] Moreover, an expert witness testified concerning a research survey he had conducted of Salt Lake and Weber County residents to determine the extent of their knowledge of the case, the source of the information, and the opinions they had formed which might affect their qualifications as jurors. Petitioner contends that no such facts were developed concerning Davis County where the trial was held. However, the trial judge took judicial notice of the fact that Davis County, which is situated between Salt Lake and Weber Counties, had as its center of population, Centerville, a town which is only 15 miles from Salt Lake. R. PT-2, at 61. The state judge concluded that a Davis County venire should contain sufficient jurors who were like Salt Lake residents in terms of their exposure to and opinions concerning the case. An extensive voir dire was conducted that, as will be discussed, confirmed the judicial notice taken. Those facts, therefore, were adequately developed.

■ Petitioner's claims concerning trial publicity, courtroom atmosphere and release of the jury between trial phases involve different facts. Other than an incident where one or more jurors were exposed to a napkin during a meal period on which there was a stick drawing depicting a hanging with the inscription "Hang the Niggers," however, petitioner has made no specific factual allegations indicating a hostile trial atmosphere or that jurors were exposed to improper influences during the trial or during the period between the guilt and penalty phases of the trial. This court is not required to grant an evidentiary hearing where the allegations in the petition are "conclusory and wholly devoid of specifics." *Bashor v. Risley*, 730 F.2d 1228, 1233 (9th Cir.) (quoting *Boehme v. Maxwell*, 423 F.2d 1056, 1058 (9th Cir. 1970)), *cert. denied*, —— U.S. ——, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984). Further, the court denies to exercise its discretion to permit an evidentiary hearing on these issues. The trial in this case was conducted more than ten years ago. As this court noted in a prior order in this case, there has been more than ample time to ascertain specific facts and the lapse of time may have dimmed memories of actual events and rendered them suggestive. *See* Memorandum Decision and Order (Sept. 2, 1981). The preliminary order granting an evidentiary hearing on this claim will therefore be vacated.

## 2. *Change of Venue, Continuance or Sequestration*

■ Due process and the constitutional right to a jury trial require that a defendant receive a "fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). When prejudicial pretrial publicity or a hostile community atmosphere preclude seating an impartial jury, the trial court must grant a defendant's motion for a change of venue, a continuance or sequestration of the jury to ensure that the trial is "fundamentally fair." *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); *see Groppi v. Wisconsin*, 400 U.S.

---

**6.** Those accounts were from the *Ogden Standard-Examiner*, the local daily newspaper in Weber County. In an affidavit submitted to the trial court in support of the motion for change of venue, Andrews stated,

Affiant concedes that the circumstances surrounding [this] case have also been reported by other newspapers in the State of Utah and have been carried on radio and television throughout the State. However, Affiant believes no coverage of the above case has been as concentrated, extensive or localized as has been the coverage by the Ogden Standard-Examiner in Weber County.

Affidavit of William Andrews (June 26, 1974), R. R-1, at 65. At a June 28, 1974 hearing on petitioner's motion for change of venue, petitioner's counsel stated, "The news coverage in this area, there have been more of the events surrounding this case, preliminary hearings and other motions have been covered much more extensively in the Ogden Standard Examiner than they have been covered in other papers and television." R. PT-1, at 17.

505, 509–11, 91 S.Ct. 490, 492–93, 27 L.Ed.2d 571 (1971); *Sheppard v. Maxwell*, 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966); *Rideau v. Louisiana*, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963).

Andrews made a motion for a change of venue from Weber County to Salt Lake County. After a full hearing, the Utah judge granted the State's motion, over Andrew's objection, to move the trial to neighboring Davis County. That change of venue was reconsidered and reaffirmed by the state judge at the time of trial. The trial court also denied Andrews' motion to sequester the jury or to continue the trial after concluding that six months between the crime and trial was sufficient to minimize any possible adverse effects the pretrial publicity may have caused. The Utah Supreme Court reviewed the record and found that the trial judge did not abuse his discretion in denying those motions.

■ Andrews contends that because of extensive and widespread pretrial publicity and strong community hostility surrounding his trial, it was impossible to select an impartial jury without a change of venue to Salt Lake County or a continuance of the trial. In *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Supreme Court held that adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed. As recently emphasized by the Supreme Court, however, "the trial court's findings of impartiality might be overturned only for 'manifest error.'" *Patton v. Yount*, —— U.S. ——, ——, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984) (quoting *Irvin*, 366 U.S. at 723, 81 S.Ct. at 1643).[7] After carefully reviewing the state record, including the voir dire transcripts, this court holds that the state courts did not commit manifest error in finding that the jury as a whole was impartial.

The record contains nineteen pages of which petitioner has acknowledged to be the most extensive pretrial media coverage. *See supra* note 6; R. R–1, at 72. Those pages were taken from the *Ogden Standard-Examiner* and reveal straight news reporting. Petitioner and his co-defendants were referred to with qualifiers such as "suspect" or "allegedly." There was no appeal for action against petitioner or any type of editorial comment. Additionally, the record before this court contains newspaper articles from Utah's three major daily newspapers that were published during the voir dire and the trial. *See* Petitioner's Memorandum of Aug. 19, 1981, app. A, B. & C. Those are likewise purely factual articles and were generally printed on inside pages of the newspapers. The reports are in no way inflammatory or denunciatory. The court concludes, as did the state courts, that the record of publicity preceding and during the trial, does not reveal a "barrage of inflammatory publicity," *Murphy v. Florida*, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975), amounting to a "huge … wave of public passion," *Irvin*, 366 U.S. at 728, 81 S.Ct. at 1645.

As evidence of community prejudice against him, petitioner points to survey results prepared by Jerry Borup, a social statistician and professor at Weber State College, that were presented to the trial court in support of the motion to change venue to Salt Lake County. Based upon standard error deviation, Dr. Borup estimated that 11.8% of Weber County residents and 37.1% of Salt Lake County residents could not properly identify the Hi-Fi Shop incident. Further, Dr. Borup estimated 19.7% of Weber County residents and 31.9% of Salt Lake County residents did not possess an opinion of guilt towards petitioner and his co-defendant. *See* Defendant's Exhibit 2, R. R–2, at 158. The survey also revealed that 25.1% of those in Weber County knew one of the victims or someone in a victim's family, and that Weber County residents had primarily heard about the

7. The "manifest error" standard is no less stringent than the standard of the habeas statute, which requires a presumption of correctness for state court findings that are "fairly supported by the record." 28 U.S.C. § 2254(d); *see Patton*, —— U.S. at —— n. 7, 104 S.Ct. at 2889 n. 7.

case through the local newspaper and word of mouth communications. By contrast, only 2.0% of those in Salt Lake County knew the victims or victims' families. Further, Salt Lake County residents were less likely to know the details of the case and oral communications were much less significant as a source of knowledge.

Petitioner alleges that prejudice against him in Davis County where the trial was conducted, was as strong or stronger than Weber County. In changing venue to Davis County, however, the state judge carefully considered Dr. Borup's survey and testimony and found that a Davis County venire would contain a sufficient number of persons similar to Salt Lake County residents, primarily in terms of their familiarity with the victims and victims' families, and that an impartial jury could be selected.

 Even assuming that there was as much knowledge of the crimes in Davis County as in Weber County, knowledge alone is insufficient to render the trial presumptively unfair. *See Dobbert v. Florida,* 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977). This court must look to the voir dire examination to determine if there is any evidence that there was "such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside." *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). The right to an impartial jury does not require a jury ignorant of the facts and issues, "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643.

The voir dire in this case was extensive and meticulous. The state judge questioned each venireman thoroughly and permitted extensive questioning by each of the

three defense attorneys and the prosecutor. Of the eighty-two prospective jurors and alternate jurors examined, eleven were excused after exercising exemptions from jury service under Utah law; seven were excused because of economic hardship or health problems; three were excused because of personal acquaintance with the victims or victims' families; one was excused because of improper voir dire questioning; one was excused because he was a reporter for the *Ogden Standard-Examiner* and was close to the investigation of the case; and fifteen were excused because of fixed opinions acquired through pretrial publicity.[8] Of the twelve jurors and one alternate empaneled, twelve stated that they had neither formed nor expressed an opinion as to the guilt of petitioner and his co-defendants. One juror stated that he had formed an opinion, but the state judge found that the juror was merely being frank, and had reached progressive degrees of calmness in setting aside his opinion, which would be eliminated by the time of trial. That juror was the only one of those empaneled that was challenged for any reason by any of the defense attorneys. Moreover, all the jurors, including the one challenged, stated that they could disregard the pretrial publicity and could be fair and impartial.

 Prior to the voir dire, the state judge could only speculate about the likelihood that pretrial publicity and community prejudice would deny petitioner a fair trial. A review of the voir dire transcripts supports the state judge's express and implied finding that a fair and impartial jury was empaneled. Only three veniremen were excused because of personal acquaintance with the victims, supporting the judicial notice taken that Davis County residents were more like Salt Lake County residents in that regard. Moreover, only fifteen of

---

**8.** Although several more potential jurors were excused for exercising exemptions from jury service provided by Utah law, *see* Utah Code Ann. § 78–46–10 (1977), only eighty-two were examined. Thirty-eight potential jurors were empanelled prior to the exercise of preemptory challenges. An additional five potential alternate jurors were empanelled, from which one alternate was chosen. One venireman was found by the state judge to be qualified, R. T–2, at 246, but apparently was later excused for reasons other than holding a fixed opinion.

the eighty-two veniremen were excused because of a fixed opinion of guilt. That proportion is similar to the situation in *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1974), in which twenty of the seventy-eight veniremen were excused because of a fixed opinion that the defendant was guilty. The *Murphy* court stated:

> This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioners as to impeach the indifference of jurors who displayed no animus of their own.

*Id.*, 421 U.S. at 803, 95 S.Ct. at 2038. Furthermore, this case is far different than *Irvin v. Dowd*, in which 90 percent of the veniremen stated they had some preconception of guilt, 268 of a panel of 430 were excused for cause, and 8 of the 12 selected as jurors thought the defendant was guilty. *See* 366 U.S. at 727, 81 S.Ct. at 1645.

Finally, the result of the trial supports the state judge's finding of impartiality. The jury which convicted Andrews and Selby of murder could not reach a verdict as to their co-defendant Keith L. Roberts, who was accused of the same offenses. This is an indication that the voir dire examination eliminated any unfairness that might otherwise have resulted from pretrial publicity. *See United States v. Haldeman*, 559 F.2d 31, 60 n. 28 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

■ The trial judge and the attorneys here questioned the prospective jurors regarding their opinions and their ability to act impartially. The state judge found that an impartial jury had been selected. The Utah Supreme Court reviewed the voir dire examination and agreed with the trial court. Although a court must look beyond a potential juror's response to questions of impartiality, *see Brinlee v. Crisp*, 608 F.2d 839, 846 (10th Cir.1979), *cert. denied*, 444 U.S. 1047, 100 S.Ct. 737, 62 L.Ed.2d 733 (1980), the circumstances in this case, when considered with the questions asked of the

veniremen, reveal a voir dire that satisfies the constitutional standards established by the Supreme Court. The jury selection process resulted in the selection of jurors free from prejudice against Andrews.

Different issues are raised by petitioner's claims of a hostile atmosphere during the trial. Andrews contends that he was denied due process because the trial court failed to sequester the jury during the trial and during the period between the guilt and penalty phases of the trial. Andrews further contends that the hostile courtroom and community atmosphere necessitating sequestration is evidenced by the napkin incident.

■ As noted by this court in its preliminary order, the state judge quickly and properly dealt with the napkin incident. During the trial the jurors were bused from the courthouse in Farmington to a cafe in nearby Bountiful. While on such trips, the jurors were kept together and provided a separate dining room in the cafe. During one lunch period, a juror found on his napkin a stick drawing depicting a hanging with the inscription "Hang the Niggers." The juror immediately gave the napkin to the bailiff who reported the incident to the judge. The napkin was seen by one juror and possibly by either or both of the two adjacent jurors. The trial judge immediately held a hearing at which the bailiff testified to the above facts. R. T–14, at 2445–56. The court denied a motion for a new trial finding that "the jurors are tougher than this" and admonished the jurors by saying, "Occasionally some foolish person will try to communicate with you. Please disregard the communications from foolish persons and ignore the same." *Id.* at 2456. This court concludes that the state judge had adequate facts upon which to base his finding and properly handled the incident. The trial court's refusal to grant a new trial based on the napkin incident did not violate petitioner's constitutional rights. *See, e.g., United States v. Albert*, 595 F.2d 283, 290 (5th Cir.) (if trial court finds juror contact to be harmless, a new trial is not required), *reh'g denied*, 599

F.2d 449, *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979).

In addition to the sequestration of the jury during lunch periods, the trial court ordered three jurors who worked at Hill Air Force Base not to report to work during the trial. Further, the court instructed the jurors not to watch or listen to news programs, or read anything in the newspaper concerning the case. The jurors were repeatedly admonished to refrain from talking with anyone about the case. The trial judge also stated that he would sequester the jury if it proved necessary during the trial. When the jurors were released between trial phases, the judge ordered those who worked at Hill Air Force Base and at least four other jurors not to go to work and strongly admonished the jury.[9]

■ As noted above, the court has reviewed the nature of the pretrial and trial publicity and is of the opinion that media reports were not inflammatory or denunciatory. Moreover, allegations of media saturation alone are insufficient to establish a constitutional violation by the trial court's refusal to sequester the jury. Absent some specific allegation, the court cannot assume that the jurors were unfaithful to the state judge's repeated instructions and admonitions. *See, e.g., United States v. Hall*, 536 F.2d 313, 326–27 (10th Cir.), *cert. denied*, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976); *United States v. Hill*, 496 F.2d 201, 203–04 (5th Cir.1974). Other than the napkin incident, petitioner has not alleged that there was actual contact by any juror to publicity or improper information during the trial or between trial phases. The state judge took steps he found to

be adequate to ensure the impartiality of the jury. Because there are no specific allegations tending to show that the state court abused its discretion in taking those steps short of sequestration, *see United States v. DePugh*, 452 F.2d 915, 923 (10th Cir.1971), *cert. denied*, 407 U.S. 920, 92 S.Ct. 2452, 32 L.Ed.2d 805 (1972), this court concludes that the failure to sequester the jury did not violate petitioner's constitutional rights. Petitioner's first claim must therefore be dismissed.

## B. *Constitutionality of Utah's Capital Sentencing Procedures*

■ Andrews next claims that he was sentenced to death under a capital sentencing procedure indistinguishable from the procedure held unconstitutional in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The court disagrees. As stated by the plurality in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976),

> *Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

*Id.*, 428 U.S. at 189, 96 S.Ct. at 2932. The Utah procedure applied in this case satisfies those concerns.

The Utah capital sentencing statutes were revised in the wake of *Furman* and resemble the Texas system upheld in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The Utah statutes lim-

---

**9.** The state judge repeatedly admonished the jury, and at the conclusion of the guilt phase stated:

> [I]t is extremely important there be no misconduct of jurors or anything of this sort, otherwise it will put a hardship on the people that is tremendous. You understand this? Everyone involved.
>
> So everyone would have to obey the rule very carefully to go ahead and if anyone tries to speak to you about the case just resist their efforts. If anybody wants to compliment you

or criticize you for your verdict or anything of this nature, tell them the proceedings are not over and to resist their efforts and of course take nothing serious that you would hear in such a way, you certainly know more about the case than anyone who would ever speak to you about it.

. . . .

... Do not let anyone talk to you in any way. All the admonitions that I have given you before please abide by them.

R., T–22, at 4112, 4114.

it capital homicides to intentional and knowing murders committed in eight enumerated circumstances. *See* Utah Code Ann. § 76–5–202 (1973).[10] Those circumstances are elements of the substantive offense of first degree murder and must be proven beyond a reasonable doubt in the guilt phase of a bifurcated proceeding.

After a first degree murder conviction, the Utah system requires a separate hearing on the issue of penalty. *Id.* § 76–3–207. Evidence may be presented on any matter the judge deems relevant to sentencing, "including but not limited to the nature and circumstances of the crime, the defendants character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty." *Id.* Aggravating circumstances are those circumstances listed as elements of the substantive offense of first degree murder. Further, the statute lists six mitigating circumstances, which may be considered with "any other fact in mitigation of the penalty." *Id.* § 76–3–207(1)(g).[11]

In proceedings before a jury, the death penalty may be imposed only upon a unanimous verdict for death. *Id.* § 76–3–207(2). The statute does not mandate a burden of proof for the penalty proceeding; however, the jury in this case was instructed that the burden is on the state to show that the totality of the evidence of aggravating circumstances outweighs the totality of mitigating circumstances. Petitioner's case was the first murder case tried under the Utah capital sentencing system and the Utah Supreme Court held that the standard applied was correct under the Utah law. *See State v. Pierre*, 572 P.2d 1338, 1347–48 (Utah 1977). The Utah court has since determined that the state must prove that the totality of aggravating circumstances outweighs the totality of mitigating circumstances, and the death sentence is appropriate beyond a reasonable doubt, *see State v. Wood*, 648 P.2d 71, 81 (Utah 1983), but that the higher standard does not apply retroactively to petitioner's case, *see Andrews v. Morris*, 677 P.2d 81 (Utah 1983).[12]

Finally, the Utah procedure provided for appellate review of the sentence to the Utah Supreme Court. The Utah Court has

---

10. The circumstances enumerated are:

(a) The homicide was committed by a prisoner who is confined in a jail or other penal institution regardless of whether such confinement is legal.

(b) At the time the homicide was committed the actor also committed another homicide.

(c) The actor knowingly created a great risk of death to a person other than the victim and the actor.

(d) The homicide was committed while the actor was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, aggravated robbery, robbery, rape, forcible sodomy, or aggravated sexual assault, aggravated arson, arson, aggravated burglary, burglary, aggravated kidnapping or kidnapping.

(e) The homicide was committed for the purpose of avoiding or preventing an arrest by a peace officer acting under color of legal authority or for the purpose of effecting an escape from lawful custody.

(f) The homicide was committed for pecuniary or other personal gain.

(g) After having previously been convicted of first or second degree murder.

(h) The homicide was committed for the purpose of preventing a witness from testifying, or a person from providing evidence, or a person from participating in any legal proceedings or official investigation.
Utah Code Ann. § 76–5–202(1) (1973).

11. The six enumerated mitigating circumstances are:

(a) The defendant has no significant history of prior criminal activity;

(b) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

(c) The defendant acted under extreme duress or under the substantial domination of another person;

(d) At the time of the murder, the capacity of the defendant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirement of law was substantially impaired as a result of mental disease, intoxication, or influence of drugs;

(e) The youth of the defendant at the time of the crime; [and]

(f) The defendant was an accomplice in the murder committed by another person and his participation was relatively minor; ....
Utah Code Ann. § 76–3–207(1) (1973).

12. The Utah court's refusal to extend the *Wood* standard retroactively is the basis for another of petitioner's claims and is discussed *infra* at part II.D. of this opinion.

interpreted the statutory grant of appellate jurisdiction and prior Utah case law [13] as providing for "a comprehensive review of the entire case, including a review of a sentence of death to determine if that sentence resulted from prejudice or arbitrary action or was disproportionate to the penalty." *State v. Pierre,* 572 P.2d 1338, 1345 (Utah 1977).[14] Indeed, the Utah Supreme Court conducted a comprehensive review in this case of the trial and sentencing proceedings and concluded that the death penalty was not disproportionate to the crime considering petitioner's "involvement in these murders and his background and characteristics." *State v. Andrews,* 574 P.2d 709, 710–11 (Utah 1977).

Petitioner contends that additional procedural safeguards are necessary to satisfy constitutional requirements. First, petitioner argues that the Utah procedure is so deficient that written findings by the sentencing authority are necessary to enable adequate appellate review. Such a feature is not present in the Texas scheme upheld in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Moreover, numerous recent state court opinions have rejected similar arguments. *See, e.g. State v. Smith,* 136 Ariz. 273, 665 P.2d 995 (1983); *People v. Kubat,* 94 Ill.2d 437, 69 Ill.Dec. 30, 447 N.E.2d 247, *cert. denied,* — U.S. —, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983). The United States Supreme Court stated in *Pulley v. Harris,* — U.S. —, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), that only some form of meaningful appellate review is necessary to safeguard against arbitrary and capricious sentencing. The Utah procedure ensures that the entire transcripts of the guilt and penalty phases of a capital trial are available for review. *See* Utah Code Ann. § 76–3–206(2) (1973). The Utah Supreme Court carefully reviewed the entire case and concluded that the death penalty had not been imposed

arbitrarily and was not disproportionate. The meaningful review provided in this case is a constitutionally adequate safeguard against the type of freakish imposition of the death penalty condemned in *Furman.*

■ Second, petitioner contends that the Utah statute is unconstitutional on its face and as applied to him because it does not require that the aggravating circumstances be alleged in the charging documents. That argument has been consistently rejected by courts considering other states' statutes. *See, e.g., Spinkellink v. Wainwright,* 578 F.2d 582, 609–10 (5th Cir.), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1978); *Songer v. Wainwright,* 571 F.Supp. 1384, 1401–02 (N.D.Fla.1983) *aff'd,* 733 F.2d 788 (11th Cir. 1984); *Mitchell v. Hopper,* 538 F.Supp. 77 (S.D.Ga.1982) *aff'd in part and rev'd in part on other grounds,* 716 F.2d 1528 (11th Cir.1983). The Utah statute itself defines the aggravating circumstances upon which the court or jury may rely. Such statutory notice satisfies constitutional requirements.

■ Third, petitioner contends that the Utah procedure does not adequately guide jury discretion. Petitioner argues that the jury should not be allowed to consider evidence that may be otherwise inadmissible merely because the trial judge deems that it has probative force, and should not be permitted to consider unenumerated aggravating and mitigating circumstances. Further, petitioner argues that Utah law fails to guide jury discretion because there are no standards by which the jury is to weigh the factors it chooses to consider. Those types of limitations are undesirable and are not constitutionally required.

■ The task of the sentencing authority is to make an individualized determination of the appropriateness of the

---

**13.** There are several Utah cases indicating that the Utah Supreme Court will *sua sponte* consider errors that are neither argued or assigned. *See, e.g., State v. St. Clair,* 3 Utah 2d 230, 282 P.2d 323 (1955); *State v. Stenback,* 78 Utah 2d 350, 2 P.2d 1050 (1931).

**14.** The statute was amended in 1977 to provide for automatic appellate review of death penalty cases. *See* Utah Code Ann. § 76–3–206(2) (Supp.1977).

death penalty based on the *"individual* characteristics of the offender and his crime." *California v. Ramos*, 463 U.S. 992, ——, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171, 1180 (1983). In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court stated that it is appropriate to allow the sentencing jury to consider any aggravating or mitigating circumstances, and commended Georgia for "not ... impos[ing] unnecessary restrictions on the evidence that can be offered at such a hearing" concluding that it is "desirable for the jury to have as much information before it as possible when it makes a sentencing decision." *Id.*, 428 U.S. at 203–04, 96 S.Ct. at 2939. The plurality observed in *Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976): "What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." As with the Texas scheme upheld in *Jurek*, the Utah system ensures that the jury will have before it information regarding the individual characteristics of the defendant and his offense, including the nature of the crime and the defendant's character, background, history, mental condition, and physical condition. *See* Utah Code Ann. § 76–3–207 (1973). *See also California v. Ramos*, 463 U.S. 992, ——, 103 S.Ct. 3446, 3455, 77 L.Ed.2d 1171, 1184 (1983). Indeed, the record indicates that such evidence was presented to the jury in this case. Petitioner was allowed to present evidence of any mitigating circumstances and in fact testified concerning his background, education and difficult childhood. The prosecution presented evidence concerning petitioner's military record, his rating as a "marginal performer of limited potential" by the Air Force, a prior theft conviction and a prison psychologist's estimate of the average term served by Utah prisoners sentenced to life imprisonment. Those items concerning petitioner's background are unarguably relevant to his individual characteristics. Further, the evidence of the average term of those imprisoned for life merely allowed the jury to consider petitioner's future dan-

gerousness. That factor is also appropriate in the required individualized evaluation. *See, e.g., California v. Ramos*, 463 U.S. 992, ——, 103 S.Ct. 3446, 3453, 77 L.Ed.2d 1171, 1181 (1983); *Jurek v. Texas*, 428 U.S. 262, 274–76, 96 S.Ct. 2950, 2957–58, 49 L.Ed.2d 929 (1976).

Regarding standards for weighing the factors presented to the sentencing authority the Supreme Court concluded in *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), "that specific standards for balancing aggravating against mitigating circumstances are not constitutionally required." *Id.*, 462 U.S. at ——, 103 S.Ct. at 2742, 77 L.Ed.2d at 249. The reason for not imposing such a restriction is obvious. As the Eleventh Circuit recently observed:

> While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard ... the relative weight is not. The process of weighing circumstances is a matter for judge and jury, and unlike facts, is not susceptible to proof by either party.

*Ford v. Strickland*, 696 F.2d 804, 818 (11th Cir.) (en banc), *cert. denied*, —— U.S. ——, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983). Rather than imposing substantive limitations on factors considered by a sentencing authority or burdens of proof, the Supreme Court has focused on procedural protections that channel jury discretion. Utah's system requires that the jury find at least one statutory aggravating circumstance as an element of the crime of first degree murder, and provides for meaningful appellate review. Those safeguards serve as an added protection against arbitrary imposition of the death penalty and obviate the need for the additional procedural protections sought by petitioner.

Fourth, petitioner contends that one of the aggravating circumstances submitted to the jury—the commission of murder for "personal gain"—is unconstitutionally vague or at least fails to "genuinely narrow the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, ——, 103 S.Ct. 2733, 2742–43, 77

**424**

L.Ed.2d 235, 249 (1983). At the guilt phase of petitioner's trial, the jury was instructed on six aggravating circumstances: (1) multiple killings; (2) creating a great risk of death to persons other than the victim and the defendant; (3) killing in perpetration of a robbery; (4) killing in perpetration of a rape; (5) killing for pecuniary gain; and (6) killing for personal gain. *See* R. R–3 at 351–52. Each of those circumstances was further defined. The court gave the following definition of killing for personal gain:

A killing for personal gain is defined in law as a killing so as to gain a substantial advantage or to rid oneself of substantial difficulty. It would be killing for personal gain if the motive for the killing was to silence a witness, prevent the discovery and prosecution of a crime, or to hide the identity of a perpetrator of crime because the escaping of such prosecution would be considered in law as personal gain.

*Id.* at 352.

A capital sentencing system must provide a " 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.' " *Godfrey v. Georgia*, 446 U.S. 420, 427, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980) (quoting *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976)). As stated by the plurality in *Godfrey,*

This means that if a state wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a state's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion." .... It must channel the sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance,"

and that "make rationally reviewable the process for imposing a sentence of death."

*Id.,* 428 U.S. at 428, 96 S.Ct. at 1765 (citations and footnotes omitted). The aggravating circumstance of killing for personal gain, as further defined by the instruction presented to the sentencing authority in this case,[15] satisfies the concerns set forth in *Godfrey*. The circumstance provides a meaningful standard for distinguishing those cases where the death penalty may be imposed. Moreover, the circumstance is clear and objective and makes the process rationally reviewable.

Even if the circumstance challenged were deemed to be constitutionally deficient, the result would be unaffected. A death sentence supported by at least one valid statutory aggravating circumstance need not be set aside merely because another aggravating circumstance does not provide a sufficient basis for imposing the death penalty. *See Zant v. Stephens*, 462 U.S. 862, ——, 103 S.Ct. 2733, 2746, 77 L.Ed.2d 235, 254 (1983). The challenged circumstance here is only one of six presented to the jury. The record indicates, and the state appellate court concluded that the evidence was overwhelming to sustain the other five statutory aggravating circumstances. Petitioner does not contend that consideration of whether the killing was for personal gain in a capital case is forbidden by the federal constitution. Moreover, there is no allegation that the challenged circumstance was emphasized in any way or resulted in the admission of improper evidence. The Utah procedure provided the constitutionally required individualized determination of the appropriateness of the death penalty. Considering the lack of any such contentions and the overwhelming evidence of the other aggravating circumstances found by the Utah Supreme Court, any possible impact of the challenged circumstance cannot fairly be regarded as a constitutional defect in the

---

**15.** The Utah Supreme Court's affirmance of this case on direct appeal implicitly approved the instruction as an accurate statement of state

law. *See Zant v. Stephens,* 462 U.S. 862, —— n. 25, 103 S.Ct. 2733, 2749 n. 25, 77 L.Ed.2d 235, 257 n. 25 (1983).

sentencing process. *Id.*, 462 U.S. at ——, 103 S.Ct. at 2748, 77 L.Ed.2d at 257.

██ Finally, petitioner contends that the Utah system is constitutionally inadequate because it failed to provide automatic comparative proportionality review by an appellate court. The Utah provision in effect at the time of petitioner's sentencing did not provide for automatic review of death penalty cases. The law was amended in 1977 to require automatic review. *See* Utah Code Ann. § 76–3–206(2) (Supp. 1977). The United States Supreme Court, however, has never constitutionally mandated automatic appellate review of death penalty cases. The Supreme Court has merely indicated that the opportunity for meaningful appellate review is essential to ensure that the death sentence is not imposed in a freakish and arbitrary manner. *See, e.g., Pulley v. Harris,* —— U.S. ——, ——–––——, 104 S.Ct. 871, 878–80, 79 L.Ed.2d 29, 39–41 (1984).[16] The petitioner in this case was afforded the right to appellate review and in fact received a comprehensive review of his case by the Utah Supreme Court. The lack of automatic review therefore did not violate petitioner's constitutional rights.

██ Further, the Utah system did not provide petitioner cross-case proportionality review of his death sentence. In *Pulley v. Harris,* —— U.S. ——, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the Supreme Court rejected the contention that proportionality review is constitutionally mandated. The *Pulley* Court noted that "there could be a system so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review." *Id.,* —— U.S. at ——, 104 S.Ct. at 880, 79 L.Ed.2d at 41. The Utah sentencing procedure used in this case, however, is not such a system, but contains adequate safeguards to prevent arbitrariness.

In sum, the features of the Utah system satisfy the concerns expressed by the Su-

preme Court in *Furman* and its progeny. The landmark cases are uniform in holding that there is no single capital sentencing procedure that is constitutionally mandated. Three features present in varying forms in California, Florida, Georgia and Texas have been held to adequately guide jury discretion to prevent the freakish, arbitrary application of the death penalty. Those features are: (1) the stage of "legislative definition," at which the class of persons eligible for the death penalty is limited by statutory aggravating circumstances; (2) the selection stage at which those defendants who will actually be sentenced to death are selected from the eligible class by "an individualized determination on the basis of the character of the individual and the circumstances of the crime;" and (3) meaningful appellate review at the selection stage. *Zant v. Stephens,* 462 U.S. 862, ——–––——, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235, 250–51 (1983); *see Pulley v. Harris,* —— U.S. ——, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Jurek v. Texas,* 428 U.S. 262, 263, 96 S.Ct. 2950, 2952, 49 L.Ed.2d 929 (1976); *Proffit v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

The Utah system, like the Texas procedure, provides for categorical narrowing at the definition stage by requiring that at least one statutory aggravating circumstance be proven beyond a reasonable doubt as an element of capital murder at the guilt phase of the trial. The Utah system also provides for individualized determination at the selection stage through its bifurcated sentencing proceeding, and provides meaningful appellate review. The court therefore concludes that the structure of the statute and its application to petitioner are constitutional.

C. *Arbitrary and Discriminatory Sentencing*

Petitioner argues in his third claim that the death penalty is imposed disproportion-

---

**16.** Indeed, it should be noted that the Supreme Court recognized that a capital defendant may waive the right to appeal a death sentence. *See*

*Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976).

ately in cases in Utah and the United States involving white victims and poor, male, black defendants. Further, petitioner alleges that he was sentenced to death, in part, because of his race, sex and economic status, and the race and economic status of the victims in this case. Petitioner cites statistics to support his claim indicating, for example, that: three of the four persons under death sentence in Utah are black; the death penalty has only been imposed in Utah where the victim was white; four black men have been convicted of murder in Utah, three of whom remain under sentence of death; and over thirty white men have been convicted of capital murder yet only one remains under death sentence. Based on the foregoing, petitioner contends that he is entitled to an evidentiary hearing.

The statistics cited by petitioner arguably tend to support his claim of disparate impact in the imposition of the death penalty in Utah based on race. Disparate impact alone, however, is insufficient to establish a Fourteenth Amendment violation. There must be a showing of intent to discriminate. *See, e.g., Spinkellink v. Wainwright,* 578 F.2d 582, 614–15 (5th Cir., *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1978). Only in the narrow instance in which the evidence of disparate impact is so strong that the only permissible inference is one of intentional discrimination will it alone suffice. *See Adams v. Wainwright,* 709 F.2d 1443, 1449 (11th Cir.) *reh'g denied,* 716 F.2d 914 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984); *Smith v. Balkcom,* 671 F.2d 858, 859 (5th Cir.) *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982). This is not such a case. There have been only ten death sentences imposed in the State of Utah since *Furman.* Six of those involved white defendants and four black defendants. No reliable or meaningful conclusions can be drawn from such a small sampling. Thus, the statistics cited by petitioner are not at all revealing, *see Adams,* 709 F.2d at 1449; *Spinkellink,* 578 F.2d at 612, 615, and can-

not alone support an inference of intentional discrimination.

Petitioner has not cited or proffered evidence of any specific act or acts evidencing that his death sentence was the product of intentional or purposeful discrimination against him, either because of his race or the race of his victims. Federal courts have consistently rejected claims of racial discrimination in death sentencing where statistical evidence of disparate impact is proffered, but there is no indication of the existence of convincing evidence of intentional discrimination. *See, e.g., Adams,* 709 F.2d at 1449; *Spinkellink,* 578 F.2d at 614–16. Without more, the court concludes that it is unnecessary to conduct an evidentiary hearing on this issue and this court's prior order allowing such a hearing was unwarranted.

In *State v. Andrews,* 574 P.2d 709, 710 (1977), the Utah Supreme Court expressly found that, "as far as the verdict of death is concerned, the evidence discloses overwhelmingly that the jury could reasonably and unarbitrarily find as it did." *See also Andrews v. Morris,* 677 P.2d 81, 98 (Utah 1983); *Andrews v. Morris,* 607 P.2d 816, 825 (Utah 1980). As noted above, it is unnecessary to conduct a federal hearing on this issue. Further, pursuant to 28 U.S.C. § 2254(d), state findings of fact are entitled to a presumption of correctness in the absence of certain enumerated circumstances, "particularly in a case where a federal court makes its determination based on the identical record that was considered by the state appellate court." *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981). The circumstances enumerated in § 2254(d) are not present in this case. Accordingly, this court defers to the state court's conclusion that the jury reasonably and unarbitrarily found that the sentence of death was appropriate. Thus, this claim must be rejected.

### D. *Arbitrary Application of State Law*

Petitioner has raised a separate claim, closely related to the claim just addressed,

that the Utah Supreme Court's refusal to extend to him retroactive application of the sentencing standard announced in *State v. Wood,* 648 P.2d 71 (Utah 1982), violates the Fourteenth Amendment. The *Wood* decision instituted a new construction of Utah law that the sentencing authority "must be persuaded beyond a reasonable doubt that total aggravation outweighs total mitigation," and that "beyond a reasonable doubt the imposition of the death penalty is justified and appropriate in the circumstances." *Id.* at 83. After carefully reviewing the opinion of the Utah Supreme Court and the briefs in *Andrews v. Morris,* 677 P.2d 81 (Utah 1983), the court concludes that petitioner's claim is wholly without merit.

 The Utah court expressly found that the *Wood* standard is one of statutory construction of the Utah law and is in no way a constitutional principal. *See id.* at 83. This court has likewise concluded that the federal Constitution does not mandate such a standard of proof at the selection stage of a capital proceeding, and that the Utah scheme adequately safeguards against the arbitrary imposition of the death penalty without the *Wood* standard. *See supra* Part II. B. of this opinion. It is clear that a federal court may not issue a writ of habeas corpus on the basis of a perceived error of state law. *See Pulley v. Harris,* —— U.S. ——, ——, 104 S.Ct. 871, 875, 79 L.Ed.2d 29, 35 (1984). Petitioner therefore would be entitled to habeas corpus relief only if the state's failure to apply the *Wood* standard retroactively to his case amounts to a Fourteenth Amendment violation.

Petitioner's claim is grounded mainly on the equal protection clause, although petitioner also implicates a violation of his due process rights.[17] The equal protection portion of petitioner's claim is merely a variant of the claim just discussed. Petitioner argues that because the *Wood* standard has been applied retroactively to other cases, the Utah Supreme Court's failure to apply the *Wood* standard in his case denied him equal protection. In support of this equal protection claim petitioner alleges that: other Utah defendants have been given the benefit of the *Wood* standard retroactively; only twice has a judge or jury returned a death sentence where the *Wood* standard was applied; and, in all other cases application of *Wood* has resulted in a life sentence. Implicit in petitioner's claim is the contention that the *Wood* standard was not applied retroactively to him or his co-defendant Selby, because of their race.

As discussed above, disparate treatment of petitioner alone is insufficient to establish an equal protection violation. In some circumstances the evidence of a racially disproportionate impact may be so compelling that no other inference may be drawn but that the treatment is the product of a racially discriminatory intent. *See Smith v. Balkom,* 671 F.2d 858, 859 (5th Cir.), *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982); *see also* discussion *supra* at Part II. C. of this opinion. The analysis and opinion of the Utah Supreme Court, however, do not permit such an inference. The Utah court rationally applied a retroactivity analysis based on federal law in concluding that the *Wood* standard need not be applied to petitioner's case.[18]

The retroactivity question was an issue of first impression under Utah law. The Utah court expressly adopted the three-pronged retroactivity analysis that has developed under federal case law. That analysis requires an examination of: "1) the purpose to be served by the new rule; 2)

---

**17.** Petitioner cites *Hicks v. Oklahoma,* 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980), as the case most directly on point. *Hicks* involved a claim based on the due process clause of the Fourteenth Amendment.

**18.** The court notes that the Utah Supreme Court alternatively applied a harmless error standard. *See Andrews,* 672 P.2d at 95–96. Because the court concludes that the *Wood* standard was not required as a matter of federal constitutional law it is unnecessary to consider the harmless error analysis. The only issue concerning *Wood* raised by Andrew's petition that merits habeas corpus consideration is whether the failure to apply *Wood* retroactively denied petitioner equal protection or due process of law guaranteed by the Fourteenth Amendment.

the extent of reliance on the old rule, and 3) the effect on the administration of justice of a retroactive application of the new rule." *Andrews,* 677 P.2d at 91. The Utah court concluded that the prophylactic purpose of the new rule—to ensure that decisions concerning the appropriateness of the death penalty are *consistently* correct— would not be served by retroactive application. The Utah court next found that the *Wood* rule was " 'a clear break from the past.' " *Id.* at 94. Such new rules of criminal procedure are almost invariably nonretroactive. *See United States v. Johnson,* 457 U.S. 537, 539, 102 S.Ct. 2579, 2581, 73 L.Ed.2d 202 (1982). As to the third prong, the Utah court found that because petitioner's conviction and sentence had been final for over six years, retroactive application "would not serve the administration of justice." *Andrews,* 677 P.2d at 93–94.

■ In an effort to show that the failure to apply *Wood* retroactively was arbitrary and discriminatory, petitioner attacks the substantive application of the Utah court's retroactivity analysis. Petitioner argues that the Utah court's failure to point out any other case that would be reversed belies its conclusion that the prophylactic purpose of the rule does not favor retroactive application. That argument, however, ignores the emphasis of the Utah court's conclusion concerning the first prong of its retroactivity analysis. The Utah court stated:

> The *Wood* standard was adopted by this Court because of the patent defects in the death penalty decision that had been made in that case and the need to prevent the recurrence of a similar problem. The purposes for its adoption therefore do not in and of themselves cast doubt on the fairness of decisions that were made, were reviewed by this Court, and became final well before *Wood* was decided.

*Id.* at 93. The Utah court concluded that the procedure applied to petitioner's sentencing, including its own repeated, careful review of petitioner's death sentence, adequately protected petitioner's fundamental rights to fairness, consistency and due process. The prophylatic purpose of the *Wood* rule, therefore, did not favor retroactive application to petitioner. This court concludes that the Utah court's application of the first prong was based on sound reasoning and was unarbitrary.

Petitioner further contends that the general rule requiring retroactive application of procedural changes affecting the burden of proof in criminal cases should have been followed by the Utah court. Petitioner relies on *Reed v. Ross,* —— U.S. ——, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984), in support of that argument:

> [R]egardless of the administrative costs involved in the retroactive application of a new constitutional doctrine, " '[w]here the *major* purpose of the new constitutional doctrine is to overcome an aspect of the criminal trial that *substantially* impairs its truth-finding function and so raises *serious* questions about the accuracy of guilty verdicts in past trials, the new rule [is] given complete retroactive effect.' "

*Id.,* —— U.S. ——, 104 S.Ct. at 2904, (quoting *Hankerson v. North Carolina,* 432 U.S. 233, 237, 243, 97 S.Ct. 2339, 2342, 2345, 53 L.Ed.2d 306 (1977)). The rule stated by the *Reed* court, however, is inapposite to the procedure at issue here. As correctly noted by the Utah Supreme Court, there exists a critical distinction between guilt-innocence determinations and the degree of certitude required in the penalty phase of a capital trial. *See Andrews,* 677 P.2d at 93. " '[S]entencing decisions rest on a far-reaching inquiry into countless facts and circumstances and not on the type of proof of particular elements that returning a conviction does.' " *California v. Ramos,* 463 U.S. 992, —— n. 21, 103 S.Ct. 3446, 3456 n. 21, 77 L.Ed.2d 1171, 1185 n. 21 (1983) (quoting *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring)).

. Based on a thorough review of the substantive basis of the Utah court's retroactivity analysis, this court concludes that the Utah court rationally and unarbitrary de-

termined that the *Wood* standard should not be applied to petitioner's case. Petitioner's equal protection claim therefore must be rejected.

Another aspect of petitioner's equal protection claim should be noted. Petitioner acknowledges that there can be a denial of equal protection only where different legal standards are arbitrarily applied to similarly situated defendants. *See Dobbert v. Florida,* 432 U.S. 282, 301, 97 S.Ct. 2290, 2302, 53 L.Ed.2d 344 (1977). Yet as evidence of racially disparate treatment by the Utah court petitioner cites *State v. Norton,* 675 P.2d 577 (Utah 1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984). In *Norton,* the Utah court applied the *Wood* standard retroactively to a white defendant one month after the decision in which retroactivity was denied to petitioner. The *Norton* court, however, recognized that the defendant in that case and petitioner were not similarly situated:

> In doing so, we stress that *Belgard's* automatic rule of retroactivity only applies by its terms to criminal cases pending on direct review when the rule is changed. That vital qualification distinguishes this case from *Andrews v. Morris,* 677 P.2d 81 (1983), in which we held that as to criminal convictions already final before the *Wood* standard was established, the question of the application of the *Wood* standard would be governed by applying three factors to the circumstances of the individual case. *Id.* at 84. On the basis of those factors, we held that petitioners whose convictions became final in 1977 did not have the benefit of the *Wood* standard in their second collateral attack on that conviction.

*Id.* at 583–84. The distinction between final and non-final criminal cases is a racially neutral justification for the different treatment afforded petitioner and is amply supported by federal law. *See, e.g., United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982); *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). Indeed, application of

the *Wood* standard only to cases pending on direct review furthers the goal of treating similarly situated defendants similarly. *See Johnson,* 457 U.S. at 555–56, 102 S.Ct. at 2590–91, 73 L.Ed.2d at 217–18. Petitioner has not pointed out any similarly situated defendant to whom the Utah court has afforded retroactive benefit of *Wood.* Thus, for the additional reason that Utah law has not been applied differently to similarly situated defendants, petitioner's equal protection claim must fail.

Finally, the due process aspect of petitioner's claim must likewise be rejected. Petitioner cites *Hicks v. Oklahoma,* 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980), as requiring that *Wood* be applied retroactively to his case. That case is distinguishable from the situation here. In *Hicks,* the defendant was sentenced under a habitual offender statute with a mandatory forty-year prison term. Subsequent to the sentencing, the state appellate court declared the mandatory sentencing provision unconstitutional. The state court nevertheless affirmed defendant Hicks' conviction and sentence, reasoning that Hicks was not prejudiced by the impact of the invalid statute since his sentence was within the range of punishment that could have been imposed in any event.

The Supreme Court found that under Oklahoma law, a convicted defendant was entitled to have his punishment fixed by a jury. That entitlement constituted "a substantial and legitimate expectation that [an Oklahoma defendant] will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, ..., and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State." *Id.,* 447 U.S. at 346, 100 S.Ct. at 2229 (citation omitted). The Court then concluded that the reason given for the failure to allow Hicks to be resentenced— "the frail conjecture that a jury *might* have imposed a sentence equally as harsh as that mandated by the habitual offender provision"—was an arbitrary disregard of Hicks' right to liberty. *Id.*

■ The rights to life and liberty of petitioner in this case, by contrast, have not been arbitrarily disregarded. Petitioner was sentenced under a constitutionally adequate procedure that afforded sufficient safeguards against arbitrary imposition of the death penalty. Moreover, the Utah Supreme Court's decision denying retroactive application of *Wood* was not based on mere conjecture or was it otherwise arbitrary. Instead it was based on a rational application of established principles of retroactivity.

E. *Disproportionality of Petitioner's Death Sentence under Enmund v. Florida*

Petitioner claims that his death sentence is improper under *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), because he was never found to have intended to kill. In *Enmund*, the Supreme Court held that the Eighth Amendment does not permit the death penalty to be imposed on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.*, 458 U.S. at 797, 102 S.Ct. at 3376–77; *see Chaney v. Brown*, 730 F.2d 1334, 1350 (10th Cir.1984). Petitioner claims he comes within the *Enmund* rule because witness Orren Walker testified that Andrews told Selby twice, "I can't do it; I'm scared," R. T–17, at 3092; T–18, at 3183–84, that Andrews "was disturbed during the whole evening," *id.* at 3176–77, and that Andrews was not present when the victims were shot, R. T–17, at 3096; T–18, at 3188.

■ This case is distinguishable from *Enmund* in that petitioner was charged with and the case was presented to the jury on a theory of intentional and knowing murder, rather than felony murder. The trial court instructed the jury on the elements of first degree murder, including the requirement that each victim was murdered "knowingly and intentionally." The jurors were further instructed that petitioner could not be found guilty of first degree murder unless he was a "party" to the killing, which required that,

A. He actually and intentionally perpetrated the murder himself, or

B. He intentionally helped plan or assisted in the advancement of the murder with intent that it would take place, and did not effectively withdraw before the killing.

C. He intentionally rendered active advice during the murder, or

D. He intentionally helped the murderer escape from the immediate scene of the crime.

R. R–3, at 352–53. The trial court also instructed the jury that, "A person is a principal in a crime only if he intentionally has aided, encouraged, or assisted in its accomplishment," and that a person that is a party to a robbery, rape or other crime is a party to a killing that occurred during the perpetration of the other crime, "only if he knew the killing was planned, or knew it was planned if certain events occur, during the crime which does in fact occur." *Id.* at 357. The testimony presented at trial indicates that petitioner was deeply involved in the killings. Andrews threatened Mr. Walker with a gun; guarded the four victims while Selby captured Mrs. Naisbitt; refilled the cup four times as Selby administered, in Andrews' presence, a potentially lethal dose of liquid drain cleaner to each victim; and helped tape the mouths of some of the victims to prevent them from expelling the caustic fluid. Although Andrews expressed his own squeemishness at shooting five victims he had already helped to poison, the evidence was sufficient for the jury to conclude that he planned and intended that the killings would take place during the robbery.

The Tenth Circuit stated in *Chaney v. Brown*, 730 F.2d 1334 (10th Cir.1984):

We agree with the Fifth Circuit, which recently held that "*Enmund* merely invalidates a death penalty when based solely upon a defendant's criminal responsibility for a killing by an accomplice that is unintended or not contemplated

by the defendant; it does not invalidate a conviction of a substantive offense of murder when guilt is so based."

*Id.* at 1350 (quoting *Skillern v. Estelle,* 720 F.2d 839, 846 (5th Cir.1983). The jury in this case was squarely presented with instructions on the substantive offense of first degree murder; and there was ample evidence in the record to support its verdict. The court therefore concludes that petitioner's *Edmund* claim must be rejected.

### F. *First Amendment Claim*

Petitioner claims that the method of execution by shooting selected by an early Utah legislature and retained in the present statute [19] was and is motivated by the Mormon doctrine of blood atonement and therefore violates the establishment clause of the First Amendment. The court rejected this claim in its preliminary order and there has been no development in the law since that order that would alter the court's conclusion.

■ The Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), established a three-part test for evaluating church-state involvement. The *Lemon* test examines whether the challenged law has a secular purpose, its primary effect or principal purpose, and whether the law promotes excessive state entanglement with religion. *See also Lynch v. Donnelly,* —— U.S. ——, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). Execution by shooting was adopted by many states at one time as a quick and inexpensive method of execution and because of humanitarian concerns over such methods as hanging. Those are clearly valid secular purposes. The primary effect of Utah's death penalty law is the punishment of capital criminals and the deterrence of capital crimes. Any religious effect or purpose for its enactment is incidental. Moreover, it cannot be said that the statute results in excessive entanglement.

### G. *Eighth Amendment Claims*

Petitioner's remaining claims challenge the method of execution by shooting, the repeated setting and staying of execution dates incident to petitioner's appeals, and the social justification for capital punishment.

■ The first claim that execution by shooting is cruel and unusual punishment in violation of the Eighth Amendment was rejected by this court in its prior order. The claim is controlled by *Wilkerson v. Utah,* 99 U.S. (9 Otto) 130, 25 L.Ed. 345 (1878), in which the Supreme Court stated that execution by shooting was not cruel and unusual. The dicta in *Wilkerson* has been cited by the Supreme Court in other recent Eighth Amendment cases, *see, e.g., Gregg v. Georgia,* 428 U.S. 153, 168 n. 12, 96 S.Ct. 2909, 2923 n. 12, 49 L.Ed.2d 859 (1976), and will be followed by this court until more authoritative guidance is given.

■ The court also rejected petitioner's claim concerning the repeated setting and staying of execution dates in its prior order. No developments since that time suggest a different conclusion. The process of which petitioner complains serves the important state interest of keeping the post conviction process moving forward at the same time it preserves petitioner's due process rights. The extensive and repeated review of petitioner's death sentence was sought by petitioner and is afforded by the Eighth and Fourteenth Amendments and by federal law. To accept petitioner's argument would create an irreconcilable conflict between constitutional guarantees and would be a mockery of justice.

■ Petitioner's challenge to the social justifications of capital punishment must also be rejected. Petitioner contends that no deterrent purpose can possibly be served by a punishment that is applied as infrequently as the death penalty. Such an argument was rejected by the Supreme

---

**19.** At the time of petitioner's sentencing, Utah law provided for execution by shooting. *See* Utah Code Ann. § 77–19–10 (1973). The statute has since been amended to include lethal injection as an execution method. *See id.* § 77–19–10(2) (Supp.1983).

Court in *Gregg v. Georgia*, 428 U.S. 153, 174–76, 96 S.Ct. 2909, 2925–26, 49 L.Ed.2d 859 (1976), in which the Court concluded that whether capital punishment is socially justifiable remains a legislative decision. The Utah legislature has concluded that capital punishment serves a valid social purpose and this court will not disturb that conclusion.

## IV. CONCLUSION AND ORDER

In sum, the court has before it the entire transcript and record of petitioner's trial, including the extensive appellate record. This case has been pending before this court since petitioner filed his original petition some six years ago. This court has endeavored to review the entire record, the memoranda submitted and the authorities cited. After careful consideration, the court concludes that petitioner's claims may be dismissed without the need for additional evidence.

For the reasons set forth herein, IT IS HEREBY ORDERED that:

1. The petition for a writ of habeas corpus is denied;

2. The preliminary order of this court entered on June 15, 1981 is vacated to the extent that it is inconsistent with this opinion;

3. The stay of execution entered by this court on December 5, 1980 is dissolved; and

4. The Clerk shall enter judgment dismissing this action.